BNE MASSACHUSETTS CORP. *vs.* ALVIN JACK SIMS,
custodian, & others.[1]

No. 90-P-934.

Plymouth. January 16, 1992. - March 2, 1992.

Present: PERRETTA, GILLERMAN, & LAURENCE, JJ.

*Corporation*, Consolidation of corporations, Valuation of stock, Stock-
holder. *Value. Interest.*

In an action to determine, under G. L. c. 156B, § 92, the "fair value" of
shares of a corporation's stock held by dissenting shareholders immedi-
ately prior to a shareholder vote approving a merger agreement, the
judge's finding of value could not stand, where he furnished no explana-
tion for his implicitly assigning equal weight to values based respec-
tively on actual trading price, on per share earnings, and on per share
book equity, and where one of the judge's own subsidiary findings had
foreclosed the use of trade prices as a "principal index"; inasmuch as it
was speculative whether the judge would have relied exclusively on the
remaining two valuations, this court remanded the case for new findings
as to value. [194-196]
In an action to determine, under G. L. c. 156B, § 92, the "fair value" of
shares of a corporation's stock held by dissenting shareholders immedi-
ately prior to a shareholder vote approving a merger agreement, the
judge's task was to establish what a willing buyer realistically would
pay for the enterprise as a whole on the statutory valuation date, rather
than to reconstruct an "intrinsic value" for each share of the enterprise.
[196-199]
On remand of an action to determine, under G. L. c. 156B, § 92, the "fair
value" of shares of a corporation's stock held by dissenting shareholders
immediately prior to a shareholder vote approving a merger agreement,
if the judge should not be persuaded by a preponderance of the evi-
dence that the financial terms of the merger agreement fixed the fair

---

[1]Alvin Jack Sims is named as custodian for H. William Sims and David
E. Sims under the Uniform Gifts to Minors Act. Additional named
defendants are Holmes, Inc., Joseph F. Carney, George L. Carney, Jr.,
Raynham Derby Club, Inc., Middleborough Agricultural Society, Inc.,
Brockton Agricultural Society, Inc., Massasoit Catering, Inc.,
Massachusetts Greyhound Association, Inc., Joseph A. Ganley, Jean H.
Caputo, Maxine F. Fuller, The Enterprise Publishing Company, John J.
Lyons, Edward S. Buchanan, and Massachusetts Bank and Trust
Company.

value of the dissenters' shares, he was to proceed to determine that value based on expert testimony already received. [199-202]

In an action to determine, under G. L. c. 156B, § 92, the "fair value" of shares of a corporation's stock held by shareholders who dissented from a vote approving a corporate merger, the judge acted within his discretion in awarding prejudgment interest at the rate of twelve percent per annum. [202]

CIVIL ACTION commenced in the Superior Court Department on December 19, 1984.

The case was heard by *J. Owen Todd*, J.

*James J. Marcellino* for the plaintiff.

*Richard M. Zinner* (*Jane P. Morse* with him) for the defendants.

GILLERMAN, J. Dissenting stockholders (the defendants) of Charterbank Inc. (Charterbank), the holding company for Plymouth-Home National Bank[2] (Plymouth), duly claimed and perfected their statutory appraisal rights following the merger of Charterbank into The Conifer/Essex Group, Inc. (Conifer), effective June 29, 1984. See G. L. c. 156B, §§ 85-98. This action was brought by Conifer[3] against the defendants on December 19, 1984, solely to determine, under G. L. c. 156B, § 92, which we set out in the margin,[4] the

---

[2]Plymouth-Home National Bank was the sole subsidiary of Charterbank.

[3]Conifer merged into BNE Massachusetts Corp. (BNE) on April 22, 1987, and BNE, upon motion, was substituted as the plaintiff in this action. Under G. L. c. 156B, § 90, either the corporation or the dissenting stockholders may bring the action to determine the value of stock of the dissenters. Papers on file in the clerk's office of this court state that BNE has filed a petition for reorganization pursuant to 11 U.S.C. §§ 101 et seq. (1988), but no substitution of parties (or appearance of new counsel) was made on this court's docket; counsel who wrote the brief argued for BNE.

[4]Section 92, as amended by St. 1983, c. 522, § 22, provides: "After hearing the court shall enter a decree determining the fair value of the stock of those stockholders who have become entitled to the valuation of and payment for their shares, and shall order the corporation to make payment of such value, together with interest, if any, as hereinafter provided, to the stockholders entitled thereto upon the transfer by them to the corporation of the certificates representing such stock if certificated or, if uncertificated, upon receipt of an instruction transferring such stock to the corporation. For this purpose, the value of the shares shall be determined as

"fair value" of the stock of the dissenters in Charterbank as of the date preceding the vote of the Charterbank stockholders approving the merger with and into Conifer.

The case was tried in February, 1990, and on April 10, 1990, the judge, in his memorandum of decision, decided that the fair value in cash of the defendants' shares of Charterbank was $101.75 per share as of March 28, 1984, the day preceding the favorable vote of the stockholders of Charterbank. Judgment was entered ordering the payment of $101.75 per share to each of the defendants, with interest at the rate of 12% per annum, compounded annually from March 28, 1984, to the tender of payment, and dismissing the defendants' counterclaims.[5] Both parties appeal, claiming that the judge erred in his determination of the fair value of the stock of the dissenters. We reverse the judgment insofar as it orders payment of $101.75 per share and remand the case for additional findings consistent with the opinion expressed herein.

1. *The business background.* The judge found the following material facts. Plymouth, which had its main office in Brockton, had seventeen branch offices throughout Plymouth County. In recent years, it had experienced a modest but steady growth in assets, deposits, and loans. By the end of 1983, it had total assets of $280 million, deposits of $255 million, and loans of $127 million.

In September, 1983, Charterbank engaged investment bankers to explore merger opportunities. By December, 1983, Charterbank had received acquisition proposals from five major banking organizations, including Conifer, and an unsolicited offer from another large banking organization. The directors of Charterbank voted to accept the Conifer offer: $101 in cash for no more than 35% of the Charterbank

---

of the day preceding the date of the vote approving the proposed corporate action and shall be exclusive of any element of value arising from the expectation or accomplishment of the proposed corporate action."

[5]The dismissal of the defendants' counterclaims is not challenged in these proceedings.

shares outstanding on the effective date of the merger,[6] with the balance of Charterbank shares to be exchanged for shares of Conifer at a rate calculated to equal $92.25. According to the plaintiff's brief, the "blended value" of the Conifer offer was $95.35.

2. *The expert testimony.* The plaintiff's expert, Arthur D. Styles, testified that in his opinion the fair value of the Charterbank stock on the valuation date was $72.45 per share — $28.55 less than the cash component of the merger terms and $22.90 less than its blended value. Styles "reconstructed" a market price[7] for Charterbank shares (there being no active market for its shares) by applying the ratios of (i) market price to earnings and (ii) market price to book values, derived from what he regarded as comparable banking institutions in New England, to the earnings and book values of Charterbank over periods of three and five years. On cross-examination, Styles acknowledged that he disregarded "the price that knowledgeable banks would pay for . . . [the] entire enterprise." Thus, none of the banking institutions selected by Styles as comparable had been acquired during the period of his review. Styles testified that his objective was to calculate what he referred to as the "intrinsic value" of Charterbank, by which he meant a value derived exclusively from an analysis of Charterbank's historic and current earnings and book values.

Marc Perkins, the defendants' first expert witness, testified that his task was "to determine the price which a knowledgeable purchaser would pay for the entire enterprise." To that end he selected eight New England banks that had been acquired by other banking organizations during 1983-1984, and calculated, in each case, the ratio (or multiple) of the adjusted acquisition price for each institution to its adjusted book value, earnings, and deposits. He then determined the average of the multiples in each category and applied those averages (enhanced somewhat for what he regarded as the

---

[6]Holders of more than 35% of Charterbank shares elected to receive cash, and a lottery was conducted in accordance with the agreement.

[7]See *Piemonte* v. *New Boston Garden Corp.* 377 Mass. 719, 725 (1979).

superior performance of Charterbank) to the book value, earnings, and deposit data for Charterbank. Next, Perkins assigned a weight to each of the three resulting values (11% to adjusted book value; 67% to adjusted earnings value, and 22% to core deposit value), and from this information he arrived at a total value of the enterprise ($35,477,000) and a value for each share of Charterbank, $118.78 — $17.78 more than the cash component of the merger terms and $23.43 more than its blended value.

The second expert witness for the defendants, James V. Sidell, relying only on his experience in acquiring banks as president of a multi-bank holding company (UST Corp.), arrived at a fair value of $120 per share based on a multiple of 2.2 applied to Charterbank's 1983 year-end book value of $54.53.

To sum up: while Styles reconstructed a market price per share of Charterbank based upon known trading prices for shares of similar institutions in established markets, Perkins calculated the likely acquisition price of Charterbank as an entire institution, based upon the known acquisition prices of similar institutions. The difference between the two approaches to valuation — market trades in shares versus entity acquisition prices — bears on the central controversy between the parties about the proper application of § 92 to the facts of this case. It is the plaintiff's claim that, to the extent that the per share price likely to be paid for the entire institution exceeds the per share price at which the shares of the institution would likely be sold in an active market, there arises what the plaintiff calls a "merger premium," and the inclusion of a merger premium in the calculation of fair value under § 92 is prohibited by the express terms of that section.

3. *The decision of the trial judge.* The judge declined, as he could, to adopt the opinion of any of the experts. See *Piemonte* v. *New Boston Garden Corp.*, 377 Mass. 719, 731 (1979). Instead, he "picked and chose from among the information furnished" and applied the "Delaware block" ap-

proach[8] to the valuation of Charterbank shares. First, he identified an actual trading price of $88 and multiplied it by one, yielding a value of $88 per share. Second, he selected Charterbank's three-year average adjusted per share earnings of $8.25 and multiplied it by thirteen, yielding a value of $107.25 per share. Lastly, he selected the three-year average adjusted per share book equity of $55[9] and multiplied it by two[10] yielding a value of $110 per share. The total of the three valuations was divided by three, yielding $101.75 as the fair value in cash for each share of Charterbank as at March 28, 1984. In this fashion, the judge reached the ultimate conclusion that "the acquisition price offered by Conifer was fair value as of March 28, 1984."[11]

The judge's valuation method is not adequate to support his conclusion. By failing to provide a separate *weight* to each of the three sources of value (market price, earnings, and book equity), see note 10, *supra*, the judge gave equal weight to each one without any explanation of why he did so. The difficulty is that there is no basis in the record for weigh-

---

[8] See *Piemonte v. New Boston Garden Corp., supra* at 724 & *id.* at 722 n.3. See also *Sarrouf v. New England Patriots Football Club, Inc.*, 397 Mass. 542, 547 n.8 (1986), describing the Delaware block approach, and *id.* at 548 n.9, for an illustration of the application of the Delaware block approach. In brief, the Delaware block approach requires the judge first to determine three separate values of the stock through an analysis of (i) market value, (ii) earnings value, and (iii) net asset value; next, a weight (expressed in portions of 100%) is assigned to each such value, based on the judge's assessment of the importance of the particular value. The weighted values are totalled and then averaged to yield the final value for the stock. The trial judge is not required to follow the Delaware block approach. *Ibid.*

[9] The judge apparently used the three-year adjusted average numbers from an exhibit prepared by Styles. However, the three-year adjusted average per share book equity in the Styles exhibit is $51.35, not $55. We find no explanation for the discrepancy.

[10] In all three calculations, the judge wrote that he "weighted" the given number, but clearly he meant that he "multiplied" the number, for that is what he did in fact; each of the three values arrived at by multiplication was weighted equally — one-third.

[11] Presumably the judge was referring to the cash component of the Conifer offer — $101. There was no reference by the judge to a "blended value" of the offer. Judgment was entered on the specific finding of $101.75.

ing the value based on market price equally with values based on earnings and book equity. The experts for both parties agreed that trading in the shares of Charterbank was too thin to provide any guidance, and market data were not used by them. Moreover, the judge himself found that the volume of trading did not "permit the use of trade prices as the sole or principal index of value."[12] Yet, as calculated by the judge, the market price of $88 made up a material portion of the final value of $101.75 — a calculation foreclosed by his subsidiary finding that trade prices could not be used as a "principal index." On the judge's subsidiary finding, not clearly erroneous, the trade price of $88 must be excluded from his calculation of fair value. See *Sarrouf* v. *New England Patriots Football Club, Inc.*, 377 Mass. 542, 549 (1986) (where stock is not regularly traded on a recognized exchange and there is no established market, the judge "cannot use market value" in his valuation calculations).

The upshot of the matter is that we are left to speculate whether, with the valuation based on market price eliminated, the judge would have relied exclusively on the earnings value of $107.25 per share and the book equity value of $110 per share. Those two values, if given equal weight, would result in a valuation of $108.62 per share, or approximately seven dollars more per share than the $101.75 adopted by the judge for each of the 50,130 shares of Charterbank owned by the dissenting defendants. The discrepancy is too material to be left to speculation. The judgment must be reversed, and the case remanded for new findings on valuation.

4. *Guidelines upon remand.* It is clear from the judge's decision that he concluded that a "merger premium" was precluded by § 92.[13] We conclude that the concept of

---

[12]Exhibit 22, to which the judge made reference in support of his finding, discloses one trade in March, 1984, one trade in February, four trades in January, eleven trades in December, 1983, one trade in November, and no trades in October. The isolated sale in March was at $88 and occurred on the valuation date, March 28th.

[13]The judge tested the existence of a premium by comparing the acquisition price with his own "constructed value," the implication being that any

"merger premium" has no place in the valuation process contemplated by § 92. We accept the possibility that there may be a difference between the valuation of the enterprise as an entirety and the value the market might assign to shares which do not represent control of the enterprise; but it is that difference to which the dissenting stockholder may be entitled under § 92. The task assigned to the court by § 92 is not to reconstruct an "intrinsic value" of each share of the enterprise but, rather, to determine what a willing buyer realistically would pay for the enterprise as a whole on the statutory valuation date. See *Sarrouf* v. *New England Patriots Football Club, Inc., supra* at 544 (the value of a "going concern . . . is the price a knowledgeable buyer would pay for the entire operation. . ."). See Principles of Corporate Governance: Analysis and Recommendations § 7.22, comment d, at 650 (Tent. Draft No. 11, 1991) ("the price that a willing buyer would realistically pay for the company as a whole is normally the best evidence of fair value . . . . [S]ales at a premium above market have increasingly become commonplace in a world where corporate control transactions are now a fact of life"). Only in this fashion can minority stockholders be assured that insiders in control of a company, burdened by conflicting interests, may not purchase the enterprise at a price less than that obtainable in the marketplace of qualified buyers and avoid paying a full and fair price to the minority. See *In re McLoon Oil Co.,* 565 A.2d 997, 1005 (Me. 1989) ("Any rule of law that gave the shareholders less than their proportionate share of the whole firm's fair value would produce a transfer of wealth from the minority shareholders to the shareholders in control. Such a rule would inevitably encourage corporate squeezeouts").

We find nothing to the contrary in *Martignette* v. *Sagamore Mfg. Co.,* 340 Mass. 136, 142-143 (1959) (emphasizing the "earnings and worth of the corporation as a going concern"), *Piemonte* v. *New Boston Garden Corp.,* 377

---

excess of the acquisition price above the constructed value would be a merger premium in violation of § 92.

Mass. at 724 (quoting with approval the cited language from *Martignette*), or *Sarrouf* v. *New England Patriots Football Club, Inc.,* 397 Mass. at 549 (emphasizing the "values easily comprehended in the hypothetical sale of the entire assets" of the company). The conclusion we reach is supported by decisional law elsewhere. See *Cavalier Oil Corp.* v. *Harnett,* 564 A.2d 1137, 1145 (Del. 1989) ("to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result"); *In re McLoon Oil Co., supra* at 1004 ("The question for the court becomes simple and direct: What is the best price a single buyer could reasonably be expected to pay for the firm as an entirety?").

The plaintiff presses on and argues that the so-called exclusivity clause of § 92 ("the value of the shares [of dissenters] . . . shall be exclusive of any element of value arising from the expectation or accomplishment of the proposed corporate action") *requires* us to focus on the 'fair value' of the stock of dissenters, not on the corporation itself. . . ." The argument has no merit. The exclusivity clause merely precludes consideration of speculative and uncertain synergistic gains that might flow to the entity that results from the merger.[14] See *Sarrouf* v. *New England Patriots Football Club, Inc., supra* at 545 n.5 ("the purpose and result of the corporate action do not . . . bear on the value of the shares"). See also, as to the same statutory clause, *Weinberger* v. *UOP, Inc.* 457 A.2d 701, 713 (Del. 1983) ("Only the speculative elements of value that may arise from the 'accomplishment or expectation' of the merger are excluded. We take this to be a very narrow exception to the appraisal process, designed to eliminate use of *pro forma* data and pro-

---

[14]For example, the *combined* entity might have a higher value per share than the sum of the separate per share values before the combination, but opinion testimony of per share values before the combination based upon pro forma projections for the combined entity would fall within the prohibition of the exclusivity clause.

jections of a speculative variety relating to the completion of the merger").

There remains to consider the weight which the trial court may give to the actual terms of the merger.

The trial judge stated, as we have said, that he reached the ultimate conclusion that his constructed value of the defendants' shares was equal to the cash component of the merger terms (see note 11, and accompanying text, and note 13, *supra*), but he did not reach that conclusion by any analysis or evaluation of the process by which the Conifer offer was selected from among the six competing offers. The judge had before him only the testimony of the three experts, exhibits prepared by them, and a stipulation of the parties as to certain facts. There was no testimony by Charterbank's investment bankers or by any officer or director of Charterbank describing the reasons that led the officers and board of directors to accept the Conifer offer rather than any of the five competing offers.[15] It was the stipulation that established that Charterbank received six acquisition proposals, one of which was unsolicited, and that the Charterbank board of directors voted to accept the Conifer proposal.

We are assisted, nevertheless, by the characterization of the Charterbank/Conifer merger process appearing in the plaintiff's brief: "The Conifer/Charterbank merger was not a 'sweetheart deal,' negotiated in a backroom or involving a distressed, unattractive acquiree. Charterbank put itself in the merger/acquisition market and retained Merrill Lynch to solicit merger offers in the context of a 'controlled auction,' a process which produced six competing bids from substantial

---

[15]General Laws c. 156B, §§ 78(*b*) and 79(*b*), require that the merger agreement be signed by the president or a vice president and the treasurer or an assistant treasurer. There is no requirement that the directors approve the agreement. The approval of the directors is, however, in practice, almost always obtained, see Southgate & Glazer, Massachusetts Corporation Law and Practice § 11.7 (1991), and in this case the parties stipulated that the directors of Charterbank voted to approve the merger agreement.

banking institutions. . . . [In short the merger was] a legal, non-fraudulent, arms-length transaction."[16]

In support of the statement that the merger was an untainted, controlled auction, the plaintiff pointed out, in a footnote to its brief, that "there was no single shareholder who controlled more than 6.3% of outstanding stock. The officers and directors as a group controlled only 31,880 shares (10.67%) individually, and another 19,678 (6.6%) through the bank itself as trustee or other fiduciary. . . . The lack of large director and officer holdings, and the arms-length nature of the merger with Conifer, make this a far different case than the freeze-out merger dealt with in *Sarrouf* v. *New England Patriots Football Club, Inc.*, 397 Mass. 542 (1986)." The defendants have made no argument to the contrary.

Assuming the plaintiff's statements are an accurate description of the transaction — an arm's-length merger agreement which was the product of a "controlled auction" among six qualified bidders and approved by the officers and directors who were free of any conflicting interest and who sought and obtained the advice of experienced investment bankers — the trial judge could appropriately consider whether the blended value of the merger price should be binding upon both parties. The plaintiff argues that the dissenting shareholders should be required to accept $22.90 less than the blended value of the merger terms, but its brief is silent as to why § 92 requires that dissenting stockholders be penalized for having dissented. Similarly, the defendants claim that they are entitled to more than the merger terms, but they suggest no reason in their cross-appeal why § 92 requires that dissenting stockholders be rewarded for having dissented. Given the untainted nature of this merger transaction — if that is the fact of the matter — we are unable to perceive any sound reason why dissenting stockholders should receive any more or less than the amount received by all other stockholders in a transaction approved by the board

---

[16]The argument there being made by the plaintiff was that the existence of a merger premium was a certainty.

of directors upon the advice of investment bankers. The purpose of § 92, as we have said, is to assure minority stockholders that those in control of the enterprise will not obtain unfair advantage. In this case, neither party has suggested that unfair advantage was sought or obtained. Section 92 was not designed to provide sellers with an opportunity for a windfall or to provide buyers with an opportunity for a bargain. The merger agreement provided what *Sarrouf* requires: a determination of the "price a knowledgeable buyer would pay for the entire corporation . . . ." *Sarrouf* v. *New England Patriots Football Club, Inc., supra* at 544. The opinion of experts, who have analyzed the experience of comparable institutions and extrapolated the results to the behavior of an hypothesized willing buyer, cannot match the reality experienced by *this* institution in setting the terms of the merger with the actual buyer who prevailed over five competing institutions.[17] Compare ·Principles of Corporate Governance: Analysis and Recommendations § 7.22(b), set out in the margin.[18] Contrast *Sarrouf* v. *New England Patriots Football Club, Inc., supra* (freeze-out merger).

On remand, the trial judge should determine the blended value in cash of the merger price (unless the value is agreed to by the parties), and he should determine whether the de-

---

[17]We point out, nevertheless, that § 92 requires that the value of the shares of dissenters be determined as of the day preceding the favorable vote of the stockholders, not as of the date the merger agreement was duly executed. It might be, for example, that, during the interval between the signing of the merger agreement and the vote of the stockholders, a material change in the condition of the company occurred. The company, or the dissenters, might be justified, in such a case, in claiming that the price set by the merger agreement should be given only nominal weight.

[18]Section 7.22(b) reads as follows: "In the case of a business combination that gives rise to appraisal rights, but does not fall within §§ 5.10 (Transactions by a Controlling Shareholder with the Corporation), 5.15 (Transfer of Control in Which a Director or Principal Senior Executive Is Interested), or 7.25 (Transactions in Control Involving Corporate Combinations to Which a Majority Shareholder is a Party), the aggregate price accepted by the board of directors of the subject corporation should be presumed to represent the fair value of the corporation, or of the assets sold in the case of an asset sale, unless the plaintiff can prove otherwise by clear and convincing evidence."

fendants are prepared to place before the court an offer of proof that the merger transaction was either (i) tainted by conflicting interests at the officer or board level, or (ii) for some other identified reason, not the genuine product of an arms-length bidding process among qualified, informed, and willing bidders. Absent such proof, the judge should consider whether judgment may appropriately be entered for the dissenters in the amount of the blended cash value of the Conifer payment, with interest. If there is an offer of proof satisfactory to the judge, he should proceed to trial on that issue. If, at the conclusion of the trial, he is not persuaded by a preponderance of the evidence that the financial terms of the merger agreement should prevail, he should proceed to a determination of the fair value of the shares of the dissenters based on the expert testimony already received.

Finally, the plaintiff contests the judge's award of prejudgment interest at the rate of 12% per annum compounded annually. See G. L. c. 156B, § 92. We have reviewed the testimony before the judge on this issue; his decision was well within the scope of his discretion. See *Sarrouf* v. *New England Patriots Football Club, Inc.*, *supra* at 551.[19]

The judgment is vacated as to payments due to the defendants, and the case is remanded to the Superior Court for additional findings on the issue of the valuation of the defendants' shares.

*So ordered.*

---

[19]The suggestion made by the plaintiff that the judge selected the 12% interest rate as "punishment" to the plaintiff is without foundation in the record.