Lauriat, J.
Plaintiff, Eugene DiCostanzo (“DiCostanzo”) , brought this action against the defendants Pericomp Corporation (“Pericomp”), FileMark Corporation (“FileMark”), Kyriacos Joannou (“Joannou”), Douglas Chandler (“Chandler”), Clotilde Zannetos (“Zannetos”), and Thomas O’Heir (“O’Heir”) to recover damages for the defendants’ alleged breach of fiduciary duty to DiCostanzo while DiCostanzo served as president and a shareholder of FileMark. DiCostanzo further seeks to recover damages for his alleged wrongful termination by the defendants from his position as president of FileMark. Finally, DiCostanzo seeks to recover $6,631.46 in business expenses. The defendants have now moved for partial summary judgment on the grounds that DiCostanzo cannot establish any damages because the FileMark stock is valueless, and that his termination was proper. For the reasons which follow, the defendants, motion for partial summary judgment is granted.
BACKGROUND
For the purposes of this motion, the following facts are undisputed:
As of August 30, 1988, DiCostanzo was the sole shareholder of Unimax Corporation, a New Hampshire corporation. Unimax’s sole asset was certain intellectual property. DiCostanzo conceptualized a computer-based software program which, if developed, would provide for the transfer of data from paper to optical disk and, thereafter, for the retrieval of this information onto a computer screen.
In September of 1988, DiCostanzo and the defendants began to discuss the possibility of Pericomp providing capital to develop the product. The parties executed the first of a series of funding and loan agreements on January 5, 1989.[1] In his opposition, DiCostanzo asserts that “the agreement provided that Pericomp would receive 60% of the FileMark stock in exchange for $750,000 of which half would be equity and half would be a loan.” (Plaintiffs Opposition, p.3.) DiCostanzo further alleges that the parties agreed that DiCostanzo would receive 30% of the FileMark stock in exchange for his ownership in Unimax and his intellectual property.[2]
Upon the formation of FileMark, DiCostanzo was elected president, chief executive officer, and chairman of the board of directors. In addition to Di *592 Costanzo, defendants Joannou, Chandler, Zannetos, and O’Heir were made members of the Board of Directors of FileMark. DiCostanzo maintained complete authority over the development and marketing of the product.
On January 9, 1991, DiCostanzo alleges that the Board of Directors of FileMark reached the following agreement:
1. The stock of FileMark would be reapportioned so that Pericomp would own 80% of FileMark. Thus, Pericomp would be able to claim FileMark as a subsidiary and use FileMark’s losses to offset Pericomp’s profits.
2. Pericomp would fund FileMark with the tax savings achieved.
3. Defendants Zannetos, Chandler, and O’Heir would return their respective stock to the treasury of FileMark.
4. DiCostanzo would release his shares (that had been placed in escrow) to the treasury of FileMark.
5. The stock returned to the treasury of FileMark would be returned to the prior owners at such time when FileMark became profitable or a public offering was made.[3]
DiCostanzo further alleges that the defendants did not comply with the January 9, 1991 agreement. In particular, DiCostanzo alleges that Pericomp never transferred its contemplated tax savings to FileMark.
As of August 24, 1992, the date on which DiCostanzo was removed as president of FileMark, File-Mark had generated annual fiscal year sales of approximately $500,000. Also as of August 24, 1992, Pericomp had loaned over $ 1,200,000 to FileMark and had invested $375,000 in equity. While DiCostanzo concedes that FileMark had a negative net worth as of August 24, 1992, DiCostanzo contends that FileMark nonetheless had a positive “fair market value.”
In August of 1992, the FileMark Board of Directors voted to remove DiCostanzo as president.[4] Following DiCostanzo’s removal, Joannou was elected president of FileMark. Joannou executed a security agreement, which DiCostanzo had refused to sign. Pericomp then loaned FileMark an additional $700,000 over the next year in an apparent attempt to develop the product. FileMark continued to maintain a negative net worth. In September of 1993, Pericomp foreclosed on its security interest in FileMark’s assets.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial, may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805 (1991), accord, Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving parly establishes the absence of triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, supra at 17. “[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
I.
In Counts I-IV of his complaint, DiCostanzo asserts that the defendants breached their fiduciary duly to DiCostanzo by failing to honor the alleged funding agreements.[5] Thus, DiCostanzo asserts that he is entitled to the value of his stock interest in FileMark as of August 24, 1992, the date of his removal from office. For the purposes of this motion only, the defendants accept DiCostanzo’s argument but contend that, even if the defendants breached their fiduciary duty, DiCostanzo suffered no damages as a result of the breach because FileMark, at all relevant times, had a negative net worth. DiCostanzo urges the court not to look merely at FileMark’s book value, but rather at the “fair market value" of the stock, which DiCostanzo asserts is positive.[6] At the very least, DiCostanzo contends that there is a triable issue of fact as to the value of the FileMark stock.
While the valuation of stock in a closely-held corporation is admittedly not an easy task, the stock value may be determined as a matter of law. Sarrouf v. New England Patriots Football Club, Inc., 397 Mass. 542, 554 (1986) (affirming the trial judge’s valuation of New England Patriots stock); Piemonte v. New Boston Garden Corp., 377 Mass. 719, 735 (1979) (upholding judge’s method of valuing Boston Garden Arena Corporation stock). In Massachusetts, the “Delaware Block” method of stock valuation has been cited with approval. Sarrouf, supra at 547, n.8; BNE Massachusetts Corp. v. Sims, 32 Mass.App.Ct. 190, 194-95 (1992). The “Delaware Block” approach requires the judge to calculate three separate values: (i) the market value, (ii) the earnings value, and (iii) the net asset value. Sims, supra at 195, n.8; Note, Valuation of Dissenters’ Stock under Appraisal Statutes, 79 Harv.L.Rev. 1453, 1456-71 (1966). The judge then assigns a weight to each value, based on the relative importance of that value to the stock in the particular *593 circumstances. Sims, supra at 195, n.8. In the case of a closely-held corporation, where there is no established market for a particular stock, actual market value cannot be used. Piemonte, supra at 725. The judge may reconstruct a hypothetical market value, but he is not obliged to do so.[7] Id.
DiCostanzo submits two affidavits in support of his proposition that the FileMark stock has a positive fair market value.[8] Richard Bloch, the former president and CEO of an unidentified computer hardware and software company, asserts that “it had been my intention in July ’92 to approach prospective investors with an offer of 40 percent (after the fact) of FileMark in the form of straight equiiy for $1,500,000 in cash.” (Bloch Affidavit, ¶5). Bloch’s statement, “after the fact,” appears to contemplate Pericomp subordinating its $2,000,000 in debt to this proposed investment. Such a condition precedent negates any inference that the FileMark stock had a positive fair market value in its own right. Moreover, Bloch clearly did not find any investors willing to make such an offer. Therefore, Bloch’s affidavit is of limited value in supporting DiCostanzo’s theory that the FileMark stock had a positive market value in August of 1992.
In DiCostanzo’s own affidavit, he lists several events which support his assertion that the FileMark stock has a positive fair market value: (1) in April of 1989, a stock option plan was adopted which set a price to purchase the stock at $6.25; (2) in 1990, a third party was considering investing in FileMark; (3) in 1990, Joannou stated that he thought the company was worth $10,000,000; (3) Pericomp told an investment banking firm in 1992 that FileMark had a $10,000,000 to $20,000,000 value; and (4) a competitor of File-Mark, with a greater deficit stockholder equity, conducted a $3,750,000 public offering. As the defendants contend, all of DiCostanzo’s statements are self-serving and unsupported by any documentary evidence. Thus, on the basis of DiCostanzo’s submissions, the court concludes that DiCostanzo has not presented any admissible evidence to establish that the FileMark stock had a positive fair market value as of August 24, 1992.[9]
The court further concludes that a reconstruction of a hypothetical market value for the FileMark stock would be guesswork at best. Thus, under the “Delaware Block” approach, the court will confine itself to an analysis of the “earnings value” and the “net asset value” of the FileMark stock during the relevant periods of time. In both 1992 and 1993, the net sales for FileMark totalled approximately $500,000.[10] As of August of 1992, FileMark’s total assets equalled $151,000, including a total of $109,000 in accounts receivable. However, FileMark’s liabilities exceeded $1,600,000, including over $1,200,000 in loans made by Pericomp. For the year ending June 30, 1992, FileMark’s net income was a negative $1,832,230. For the year ending June 30, 1993, stockholder equity was a negative $2,520,000 and FileMark suffered a net loss of $688,000. Thus, giving equal weight to both the “earnings value” and the “net assets value,” the court must conclude that the FileMark stock was valueless on August 24, 1992.
DiCostanzo contends that Pericomp’s failure to fund FileMark with its tax savings caused FileMark’s demise. The defendants have submitted, under seal, Pericomp’s tax returns for the years 1990 through 1993. During those years, Pericomp only received a tax refund in 1990, in the amount of approximately $290,000. Pericomp’s profits in 1990 and 1991 to-talled less than $250,000. Pericomp earned no profits in 1992 or 1993. In short, the total tax savings Peri-comp could have realized through its consolidation was approximately $400,000. In light of FileMark’s $1,600,000 liability, this injection of equity would not have been enough to enable FileMark to operate profitably. Thus, DiCostanzo’s contention that Pericomp’s breach of its alleged agreement to fund FileMark with tax savings resulted in the collapse of the company is unsupported by Pericomp’s tax returns. The court concludes that the defendants are entitled to summary judgment on DiCostanzo’s breach of fiduciary duty claims.
II.
DiCostanzo asserts a claim against the defendants for wrongful termination. DiCostanzo alleges that he was fired by the Board of Directors of FileMark for refusing to sign backdated documents which would allow Pericomp to reap premature tax benefits in 1990.[11] Thus, DiCostanzo asserts that he was wrongfully terminated in violation of public policy.[12] The defendants contend “that the Board voted to remove DiCostanzo as president because he had repeatedly ignored directions of the board of directors with respect to, among other things, the execution of various documents necessary to evidence the loans between Pericomp and FileMark.” The defendants further contend that DiCostanzo “began the practice of altering loan documents, required by Pericomp and approved by the entire FileMark Board, including DiCostanzo, prior to executing them.” (Defendants’ Memorandum, p. 6;)
An individual who is employed for an indefinite term is an at-will employee. Askinas v. Westinghouse, 330 Mass. 103, 106 (1953). As a general rule, an employee-at-will may be terminated with or without notice for almost any reason or no reason at all. Kolodziej v. Smith, 412 Mass. 215, 221-22 (1992); Jackson v. Action for Boston Community Development Inc., 403 Mass. 8, 9 (1988). An exception to the general rule is stated when an employee is terminated in violation of a well-defined public policy. DeRose v. Putnam Management, Inc., 398 Mass. 205, 209 (1986); Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 472-73 (1992), citing Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School, 404 Mass *594 145, 146 (1989), and Flesner v. Technical Communications Corp., 410 Mass. 805, 811 (1991). “The court consistently has interpreted the public policy exception narrowly, reasoning that to do otherwise would ‘convert the general rule . . . into a rule that requires just cause to terminate an at-will employee.’ ” King v. Driscoll, 418 Mass. 576, 582 (1994), quoting Smith-Pfeffer, supra at 150.
In Smith-Pfeffer, the Supreme Judicial Court stated that “redress is available for employees who are terminated for asserting a legally guaranteed right, for doing what the law requires, or for refusing to do that which the law forbids.” Smith-Pfeffer, supra at 149-50. DiCostanzo is apparently asserting that his refusal to sign the allegedly backdated documents falls within the third protected category.
DiCostanzo has failed to establish that the defendants’ conduct in connection with the documents rises to the level of a violation of public policy. In Mello v. Stop & Shop Companies, Inc., 402 Mass. 555, 560-61 (1988), the court held that the violation of internal company policies and allegations of insurance fraud did not state a cause of action for violation of public policy. While DiCostanzo asserts that the documents in issue constituted an attempt by the defendants to perpetrate a tax fráud, Pericomp was audited in 1990 and the Internal Revenue Service did not so conclude. Thus, DiCostanzo at most alleges an internal dispute over the documentation of the Board’s resolutions. An internal corporate dispute does not constitute a violation of well-defined public policy.[13] See Wright v. Shriners Hospital for Crippled Children, supra at 480 (public policy not violated because employee’s termination involved an internal corporate investigation). The court concludes that the defendants are entitled to summary judgment on DiCostanzo’s wrongful termination claim.
III.
DiCostanzo finally asserts a claim for $6,631.46 in unpaid business expenses against FileMark. DiCostanzo alleges that on December 24, 1992, Dale Burnett, a Pericomp employee who was loaned to FileMark on a part-time basis as Chief Financial Officer, approved the payment of $6,631.46 to DiCostanzo. DiCostanzo, however, has submitted no documentary evidence supporting his claim. Absent any evidence to support DiCostanzo’s assertion, summary judgment must be entered for the defendants on this claim.
ORDER
For the foregoing reasons, the Defendants’ Motion for Partial Summary Judgment is ALLOWED.

 DiCostanzo contends that the initial funding and loan agreement was reached on October 6, 1988. DiCostanzo submits a two-page letter from Joannou in which Joannou purports to describe the terms of the agreement. The date of the first agreement between the parties is not material to this dispute.

 Again, DiCostanzo relies on Joannou’s letter of October 6, 1988 to represent his understanding of the agreement. The defendants rely on the thirteen-page “stock purchase and funding agreement.” (Exhibit A to the Affidavit of Clotilde Zannetos.) The defendants contend that the essential terms of the agreement are as follows:
Pericomp would purchase a certain amount of Unimax stock for $50,000. Unimax would then be merged into a new corporation named LaserFlIe (subsequently renamed File-Mark). Pericomp would provide an additional $200,000 of funding and, if satisfied with the developmental results, Pericomp would provide an additional $500,000. The Funding Agreement provided that $325,000 would be invested in equity and $325,000 would constitute loans.
This dispute as to which agreement controls is not material because the defendants’ primary assertion is that File-Mark was valueless, even after many injections of capital by Pericomp.

 DiCostanzo submits the “minutes” of the January 9,1991 meeting to support his claim. The minutes consist of a two-page document, which is exclusively signed by DiCostanzo as “clerk pro tem.” The defendants deny the existence of any such agreement. However, solely for purposes of this Motion, the defendants have assumed, arguendo, that the meeting and the agreement took place as DiCostanzo contends.

 DiCostanzo alleges that the Board terminated him because he refused to sign backdated documents regarding FileMark’s reorganization. DiCostanzo has not submitted these documents to the court.
The defendants contend that DiCostanzo was removed because he “repeatedly ignored directions of the Board of Directors with respect to, among other things, the execution of various documents necessary to evidence the loans between Pericomp and FileMark.” (Defendant’s Motion for Summary Judgment, p. 6.) The defendants also contend that the Board offered DiCostanzo a paid consulting position with the company, which DiCostanzo rejected.

 Count I alleges, inter alia, that the defendants failed to entertain proposals from investors, refused to fund FileMark with tax savings, and fraudulently attempted to transfer their FileMark stock to Pericomp. Count II alleges that the defendants’ refusal to transfer tax savings to FileMark constituted a breach of the reorganization contract. Count III alleges that the defendants failed to issue the “phantom stock” as required by the reorganization contract. Count IV alleges that the defendants’ withholding of funding constituted a breach of fiduciary duty to DiCostanzo.

 DiCostanzo contends that the value of the stock of a closely-held corporation must be determined with reference to the following factors:
a. The nature of the business and the history of the enterprise from its inception.
b. The economic outlook in general and the condition and outlook of the specific industry in particular.
c. The book value of the stock and the financial condition of the business.
d. The earning capacity of the company.
e. The dividend paying capacity.
f. Whether or not the enterprise has good will or other intangible value.
g. Sales of the stock and the size of the block of stock to be valued.
Goldberg, Valuation of Divorce Assets, West Publishing Co., 1984.

 The Delaware cases require the reconstruction of market value only when a hypothetical market value can be reasonably reconstructed.

 DiCostanzo originally submitted three affidavits, that of James Walckner, Richard Bloch and DiCostanzo. At oral argument, plaintiffs counsel conceded that the Walckner affidavit, due to its lack of foundation, was not competent evidence of value.

 DiCostanzo also presented the 1993 annual report from a company named Imtech. Imtech is the parent company of INSCI. DiCostanzo asserts that INSCI has a positive fair market value and, thus, the court may draw an analogy between INSCI and FileMark to conclude that FileMark has a positive fair market value. However, DiCostanzo has failed to establish a proper foundation regarding any similarities or distinctions between INSCI and FileMark, which would allow the court to rule on the relevance of Imtech's annual report to the present litigation. In the absence of such a foundation, the court concludes that the document would not be admissible at trial. The court therefore will not consider the annual report for the purposes of this motion.

 In 1992, the net sales were $497,327. In 1993, the net sales were $504,374.

 DiCostanzo has failed to submit the backdated documents to the court. The only document with signatures which DiCostanzo has produced is entitled “Unanimous Consent in Lieu of Special Meeting of Board of Directors.” In this document, the exclusive reference to 1990 states “that the directors wish to record the cancellation on March 31, 1990, of Cert. No. 5 for 5,000 shares of Common stock of the Corporation held in escrow for Eugene DiCostanzo, which shares were never issued to Mr. DiCostanzo." (Exhibit BB to DiCostanzo’s Affidavit.)

 DiCostanzo acknowledges that “there are no Massachusetts cases specifically citing the backdating of documents as fraudulent and against public policy.” (Plaintiffs Opposition, p. 7.)

 The defendants highlight the insufficiency of DiCostanzo’s proof that he was fired for refusing to sign certain corporate documents. DiCostanzo exclusively submits his own affidavit in support of his claim. In concluding that DiCostanzo failed to establish a violation of public policy, the court need not address this issue.