Lee C. RITCHIE, as Director of Rupe Investment Corporation and as Trustee for the Dallas Gordon Rupe Trust, Paula Rupe Dennard, as Director of Rupe Investment Corporation and as Trustee for the Dallas Gordon Rupe Trust and as Trustee for the Paula Dennard Management Trust, Dennis Lutes as Director of Rupe Investment Corporation and as Trustee for the Paula Dennard Management Trust, and Rupe Investment Corporation, Appellants,

v.

Ann Caldwell RUPE, as Trustee for the Dallas Gordon Rupe, III 1995 Family Trust, Appellee.

No. 05–08–00615–CV.

Court of Appeals of Texas, Dallas.

March 28, 2011.

Rehearing Overruled April 27, 2011.

Hilaree A. Casada, Cowles & Thompson, Robert B. Gilbreath, Hawkins, Parnell, Thackston & Young, LLP, Michael L. Hurst, Amy Davis Benavides, Katherine Khristine Elrich, Hermes Sargent Bates, L.L.P., Dallas, for Appellants.

Charla G. Aldous, Aldous Law Firm, Steven E. Aldous, Robert R. Varner, Jr., Braden, Varner & Aldous, P.C., Jeffrey S. Levinger, Brett Kutnick, Hankinson Levinger LLP, Dallas, for Appellee.

Before Justices MOSELEY, FITZGERALD, and LANG–MIERS.

## OPINION

Opinion By Justice MOSELEY.

This case involves claims for shareholder oppression filed by a minority shareholder in a closely held corporation, Rupe Investment Corporation ("RIC"). The trial court determined the plaintiff minority shareholder, Ann Caldwell Rupe as trustee for the Dallas Gordon Rupe, III, 1995 Family Trust ("Buddy's Trust"), had been subjected to shareholder oppression by RIC and some of its shareholders and directors ("appellants"). The trial court ordered appellants to cause RIC to redeem Buddy's Trust's stock in RIC (the

"Stock") for $7.3 million, which the jury found to be the Stock's fair value. The trial court also awarded Ann[1] attorney's fees in the event of an unsuccessful appeal by appellants.

The evidence is undisputed that appellants told Ann and her representative that they refused to meet with, and refused to allow any RIC management personnel to meet with, any prospective purchasers of the Stock. Based on the evidence and circumstances of this case, we conclude appellants' actions in connections with Ann's efforts to sell the Stock to third parties constituted oppressive conduct. We also conclude the trial court did not abuse its discretion in ordering appellants to cause RIC to buy out the Stock as an equitable remedy for this conduct. However, we conclude the trial court erred in ordering the Stock be purchased for a price that did not constitute fair market value. We also conclude the trial court erred in conditionally awarding Ann appellate attorney's fees. Accordingly, we affirm the trial court's judgment in part and reverse in part. We reverse the trial court's judgment as to Ann's appellate attorney's fees, and we render judgment that she take nothing on her claim for attorney's fees. We reverse the trial court's judgment as to the amount to be paid by RIC for the Stock, and we remand

the case for further proceedings to determine the fair market value of the Stock. We affirm the rest of the trial court's judgment.

# I. BACKGROUND

## A. RIC

RIC was founded by Dallas Gordon Rupe, Jr., a/k/a "Pops," and Robert Ritchie. By the time of the events in this case, all of RIC's common stock[2] was held by their descendants or in trusts[3] for the benefit of their descendants. In 2002, the principal players included: Pops's children, who were Paula Dennard ("Paula") (chairman of RIC's board of directors) and Dallas Gordon Rupe, III ("Buddy") (a director of RIC); Lee Ritchie ("Ritchie") (Robert Ritchie's son, RIC's president, and one of its directors); and Dennis Lutes ("Lutes") (one of RIC's directors and one of its attorneys). In 2002, the relevant voting shareholders[4] of RIC were:

- Paula and Ritchie as co-trustees of the Dallas Gordon Rupe Trust ("Pops's Trust"), who owned 46.6 percent of RIC's voting stock;
- Paula and Ritchie as co-trustees of the Ruby L. Rupe Trust No. One for Grandchildren ("Ruby's Trust"),[5] who owned 7.4 percent of the voting stock;

---

1. Unless otherwise indicated, all references to Ann are to her in her capacity as trustee of Buddy's Trust.

2. RIC had three classes of stock: Class A preferred stock, and Class B and C common stock. Only the Class B common stock had voting rights.

3. A trust is not a separate legal entity that may sue or be sued. *Ray Malooly Trust v. Juhl*, 186 S.W.3d 568, 570 (Tex.2006) (per curiam). Lawsuits by or against trusts must be brought by or against the legal representative, the trustee of the trust. *See id.* A trust is a fiduciary relationship between the trustee, who holds legal title to the property, and the

beneficiaries, who hold the beneficial interest in the property. *See* Tex. Prop.Code Ann. § 111.004(2), (4), (18) (West Supp. 2010) (defining "beneficiary," "express trust," and "trustee"); *Ditta v. Conte*, 298 S.W.3d 187, 191 (Tex.2009).

4. The percentages stated are not exact due to rounding. The remaining shares (approximately 8.3%) are not material to this appeal.

5. This trust was created by Pops's wife, Ruby, for the benefit of Paula's three children and Buddy's adopted daughter, Robin. The RIC shares owned by the trust were distributed to these grandchildren following Ruby's death in 2006.

- Paula and Lutes as co-trustees of the Paula Dennard Management Trust ("Paula's Trust"), who owned 18 percent of the voting stock;
- Ritchie, who personally owned 1.7 percent of the voting stock; and
- Buddy as trustee of Buddy's Trust, who owned the Stock (which comprised 18 percent of the voting stock); Buddy was trustee until his death on September 22, 2002.

After Buddy died, his wife, appellee Ann Caldwell Rupe, succeeded him as trustee of Buddy's Trust.

## B. Disputes Among the Parties

The record reflects that several disputes among the individuals in their various capacities came to a head in the months following Buddy's death. For purposes of our discussion, the overriding dispute here concerns Ann's efforts to sell the Stock to third parties. There is no shareholders' or buy-sell agreement, right of first offer, or other restriction on the sale of the Stock to third parties. Although not required to do so, Ann contacted Ritchie about RIC buying the Stock. After some attempts, they were unable to reach an agreement for the sale of the Stock to RIC.[6] Ann then sought to market the Stock to third parties.

## C. Ann's Efforts to Sell the Stock to Others

In 2004, Ann hired a retired capital fund manager, George Stasen, to help sell the Stock to third parties. Stasen met with Ritchie, Paula, and her children and sought their cooperation with his efforts to sell the Stock. Stasen testified that Ritchie told him that neither Ritchie nor any member of RIC's management would meet with any prospective purchasers of the Stock. In addition to Ritchie's own testimony confirming this, the record contains a fax from Ritchie to Ann dated February 1, 2006, stating that "it would be inappropriate for me or any other officer or director of [RIC] to meet with your prospects or otherwise participate in any activities relating to your proposed sale of stock."

Stasen testified that after the meeting, he felt it would be extraordinarily difficult to market the Stock to a third party because any investor would want to meet with RIC's management and RIC's management had made it clear they did not want to meet anyone. He said that interviewing corporate management was a regular part of a prospective investor's due-diligence process for determining whether to invest in a closely held corporation, and that management's refusal to meet with prospective investors made the Stock impossible to sell. Stasen testified that he "got laughed at" by prospective investors when he told them they could not meet with management. Stasen estimated the book value of the Stock at $3.9 million, but he discounted the Stock, pricing it at $3.4 million "[b]ecause I knew it would be incredibly difficult to sell this without offering a discount" because RIC's management refused to meet with prospective buyers. Stasen testified the chance of selling stock in a closely held corporation without affording the prospective purchaser an opportunity to meet with management was "zero." Ultimately, Stasen was unable to sell any of the Stock, "[b]ecause you cannot make a decision on an investment from this limited information without meeting the executives of [RIC] and with-

6. RIC initially declined to make an offer, but later offered to purchase all the Stock for $1 million cash. Later, RIC offered to purchase all the Stock for $1.7 million, consisting of a combination of cash and debt.

out meeting the executives of the principal holdings."

## D. Ann's Lawsuit

On July 21, 2006, Ann sued Ritchie, Paula, and Lutes in their individual capacities. Ann later added RIC as a defendant. Ann's causes of action included shareholder oppression and breach of fiduciary duty, as well as a demand for access to RIC's books and records. Ann sought an order requiring the defendants to purchase the Stock "at a fair market value" or an order appointing a receiver to liquidate RIC. Ann also sought attorney's fees for efforts involved in obtaining access to RIC's books and records.

The case was heard by a jury in a trial lasting over two weeks. During the trial, and over appellants' objection, the trial court granted Ann's motion for leave to amend her petition to change the capacity in which Ritchie, Paula, and Lutes were sued from their individual capacities to their capacities as the directors of RIC and as the trustees of the various shareholder trusts.

The jury returned a verdict on the issues submitted to it. After conducting a post-trial hearing, the trial court signed a judgment ordering appellants to cause RIC to buy out the Stock for $7.3 million, the "fair value" of the Stock as found by the jury. The judgment conditionally awarded Ann appellate attorney's fees, but did not award her attorney's fees for trial.[7]

The trial court also signed and filed findings of fact and conclusions of law, containing forty-three numbered findings of fact and twelve numbered conclusions of law.[8] The trial court concluded, as a matter of law, that appellants had acted oppressively towards Ann in several respects, including their refusal to cooperate with Ann's attempts to sell the Stock to a third party.[9] Appellants timely filed their appeal.

## II. APPELLANTS' GENERAL ATTACK ON THE TRIAL COURT'S FINDINGS OF FACT

In their third issue, appellants assert that "[t]he trial court's findings of fact and conclusions of law are erroneous and should be vacated because they are not limited to the issues decided solely by the trial court and they are not supported by legally or factually sufficient evidence." In the argument portion of their brief most closely relevant to this contention, appellants identify five ·matters or issues that they assert were tried to, and decided by, the trial court. They then assert:

All other issues should have been presented to the jury by Ann and should not have been made by the trial court.... Yet the trial court's findings address the whole case, including claims

- causing RIC to withhold corporate books and records from Ann;
- making redemption offers to Ann as trustee of Buddy's Trust that were not in accordance with RIC's policy;
- making Ann a conditional offer to be on the board of directors in exchange for her not pursuing legal action against another RIC shareholder; and
- causing RIC to pay some of Paula's personal expenses.

---

7. The trial court did not award attorney's fees for trial, despite a jury finding of the amount, because Ann failed to segregate the fees that could be awarded from those that could not.

8. The trial court's findings of fact and conclusions of law also state that "[t]o the extent necessary, each of the findings of fact shall be treated as a conclusion of law and each conclusion of law shall be treated as a finding of fact."

9. The trial court also concluded that appellants acted oppressively by:

and parties that were not at issue and/or were not presented to the jury, and fact questions that were answered by the jury. For these reasons, Findings 1–43 and Conclusions 1–4 are wholly inappropriate and unnecessary and should be disregarded.... *[S]ee also* arguments at 16 CR 3297–3322.

(Case citations omitted.)

▮ Appellants' general attack on the trial court's findings and conclusions is not persuasive. Generally, failure to submit or request a jury question on a ground of recovery or defense results in waiver of that ground on appeal. TEX.R. CIV. P. 279.[10] However, jury questions "should not be submitted where the facts in question are conclusively established." *T.A. Manning & Sons, Inc. v. Ken–Tex Oil Corp.*, 418 S.W.2d 324, 326 (Tex.Civ.App.-Austin 1967, writ ref'd n.r.e.); *see also City of Brenham v. Honerkamp*, 950 S.W.2d 760, 769 (Tex.App.-Austin 1997, pet. denied) ("A proposition conclusively established by the evidence should not be submitted to the fact finder."). Further, in certain circumstances the trial court may make findings of fact on elements of a ground of recovery or defense that were omitted from the charge. *See* TEX.R. CIV. P. 279. When part of a cause is decided by the jury and part by the court, a party may request and the court may issue findings of fact and conclusions of law on the court-decided issues. *See Toles v. Toles*, 45 S.W.3d 252, 264 n. 5 (Tex.App.-Dallas 2001, pet. denied), and the cases cited therein.

Appellants' brief admits—and our review confirms—that at least some of the trial court's findings of fact relate to matters that were conclusively established. We fail to see—and appellants do not explain—how those findings "probably caused the rendition of an improper judgment." *See* TEX.R.APP. P. 44.1(a)(1). Further, appellants' brief does not discuss whether any of the trial court's findings of fact are permitted under rule 279. Neither does appellants' brief indicate which of the trial court's findings they contend address "claims and parties that were not at issue" or address "fact questions that were answered by the jury." Instead, appellants merely assert that we should disregard them all.

To the extent necessary, we will address appellants' specific complaints about specific findings of fact. However, we reject as inadequately briefed appellants' blanket assertion in their third issue that we should disregard all of the trial court's findings of fact. *See* TEX.R.APP. P. 38.1(i).[11]

---

**10.** When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to and found by the jury, and one or more of such elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon, the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment.
TEX.R. CIV. P. 279.

**11.** As stated above in the quote from appellants' brief, appellants also refer us to twenty-six pages in the clerk's record containing arguments they made in their objections to the trial court's findings of fact and conclusions of law and request for additional or amended findings and conclusions. Appellants' request that we consider an additional twenty-six pages of objections and arguments not included in their brief is inappropriate, particularly when doing so would circumvent the page limitations of rule 38.4(d). *See* TEX.R.APP. P. 38.4(d) (briefs "must be no longer than 50 pages"); *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 97 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

## III. APPELLANTS' ARGUMENTS FOR REVERSAL AND RENDITION

In their first issue, appellants contend the trial court's judgment should be "reversed and judgment rendered for Appellants." In support of this issue they make several arguments. They assert that the court-ordered buyback of the Stock is not an available remedy for shareholder oppression under Texas law; that their actions do not constitute shareholder oppression as a matter of law; and that the buyout remedy is inappropriate here because it is "unduly harsh" under the circumstances.

### A. Standard of Review

■ Construction of statutes is a question of law for the courts. *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex.2000). Whether certain conduct constitutes shareholder oppression is also a question of law. *Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). We review questions of law de novo. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 239 (Tex.2003).

■ The trial court's order that appellants cause RIC to buy out the Stock was an exercise of its equitable authority. " 'The expediency, necessity, or propriety of equitable relief' is for the trial court, and its ruling is reviewed for an abuse of discretion." *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 428–29 (Tex. 2008) (quoting *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex.1979)); *see Edwards v. Mid–Continent Office Distribs., L.P.*, 252 S.W.3d 833, 836 (Tex.App.-Dallas 2008, pet. denied) ("a trial court exercises broad discretion in balancing the

equities in a case seeking equitable relief"). A court ordering equitable relief has discretion to decree "full and exact justice for all parties." *Bush v. Gaffney*, 84 S.W.2d 759, 764 (Tex.Civ.App.-San Antonio 1935, no writ). However, a court may not provide equitable relief beyond that amount. *See id.* ("A court of equity . . . will make restitution, but not reprisals. It will fill full the measure of compensation, but will not overflow it with vindictive damages."). A trial court abuses its discretion when it acts arbitrarily or unreasonably without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985).

### B. Is a Buyout an Available Remedy for Shareholder Oppression?

Appellants assert that the court-ordered buyback of the Stock is not an available remedy for shareholder oppression under Texas law. They argue the only relief available for shareholder oppression under Texas law is the appointment of a receiver to "rehabilitate" the corporation. Appellants state in their brief: "If the Legislature had intended to create an oppression cause of action for relief other than a receivership, it would have done so clearly and directly." Because we conclude the legislature has in fact done so, we reject appellants' argument.

■ Texas law expressly authorizes a trial court to appoint a receiver to "rehabilitate" a corporation if, *inter alia*, "the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent." TEX. BUS. CORP. ACT art. 7.05(A)(1)(c) (expired Jan. 1, 2010).[12]

---

12. *See* Act of Mar. 30, 1955, 54th Leg., R.S., ch. 64, art. 7.05, 1955 Tex. Gen. Laws 239, 290–91, *amended by* Act of May 3, 1961, 57th Leg., R.S., ch. 169, § 1, 1961 Tex. Gen. Laws, 319, 319, *expired Jan. 1, 2010*, Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 2, 2003 Tex. Gen. Laws 267, 595 (now codified at TEX. BUS. ORGS. CODE ANN. §§ 11.402, .404 (West 2010)).

However, this remedy is available "only ... if *all other remedies* available either at law or in equity ... are determined by the court to be inadequate." *Id.* art. 7.05(A) (emphasis added). Thus, receivership is a remedy for shareholder oppression, but only as a last resort in the event other, less drastic equitable remedies are inadequate. Rather than barring such lesser equitable remedies, article 7.05(A) clearly envisions that they are available and, if adequate, preferable to the remedy of appointing a receiver to take over the affairs of the corporation in order to rehabilitate it.

In *Patton v. Nicholas,* 154 Tex. 385, 279 S.W.2d 848 (1955), the supreme court addressed the trial court's discretion to fashion equitable relief in shareholder disputes. There the minority-shareholder plaintiffs sued the corporation and the majority shareholder (who was also its president and a director) for fraud and abuse of his controlling position over the corporation. *Id.* at 849.[13] The trial court appointed a receiver to liquidate the company. At that time, no statute authorized the appointment of a receiver (for liquidation or rehabilitation) to remedy such conduct. Although the supreme court reversed the order of liquidation, it held that "under their general equity powers" Texas courts may appoint a receiver for liquidation of a corporation in an extreme case, or for "the less drastic purpose of 'rehabilitation.'" *Id.* at 856–57.[14]

In *Davis v. Sheerin,* 754 S.W.2d 375 (Tex.App.-Houston [1st Dist.] 1988, writ denied), one of our sister courts recognized that a "buyout" is an available—and sometimes appropriate—remedy for shareholder oppression. There the trial court found the majority-shareholder defendant acted oppressively toward the minority-shareholder plaintiff, appointed a receiver for the corporation, and ordered the majority shareholder and the corporation to buy out the plaintiff's interest in the corporation at the value found by the jury. *Id.* at 378. The court stated that "Texas courts, under their general equity power, may decree a 'buy-out' in an appropriate case where less harsh remedies are inadequate to protect the rights of the parties." *Id.* at 380. In doing so, the court observed that *Patton* had been cited as support for the proposition "that a dissolution statute[ ] does not provide the exclusive remedy for injured shareholders, and that courts have equitable powers to fashion appropriate remedies where the majority shareholders have engaged in oppressive conduct." *Id.* at 380 (citing *Masinter v. WEBCO Co.,* 164 W.Va. 241, 262 S.E.2d 433, 439–40 & n. 7 (1980)).[15]

The Texas Business Corporation Act, although now expired, was the applicable statutory authority when the trial court rendered its judgment.

**13.** The supreme court characterized the theory of the plaintiffs' case as "one for mismanagement of the corporation or misconduct in the handling of its affairs to their prejudice or that of the corporation itself or both." *Patton,* 279 S.W.2d at 852.

**14.** In reaching this conclusion, the supreme court mentioned article 7.05 and 7.06 of the newly enacted, but not yet effective, Business Corporation Act, which it characterized as having an "approach to this type of case [as]

one of 'rehabilitation' in preference to dissolution or liquidation." *Patton,* 279 S.W.2d at 854.

**15.** The court of appeals in *Davis* noted that the courts in five states with statutes that, like article 7.05, authorized the appointment of a receiver and liquidation of the corporation for shareholder oppression, had authorized buyouts of the oppressed shareholder as an appropriate remedy even in the absence of express statutory authority. *Davis,* 754 S.W.2d at 379. The court also recited that the legislatures of six other states had expressly authorized the buyout of an aggrieved minority shareholder. *Id.*

Other courts have followed the holding in *Davis*,[16] and appellants cite no authority rejecting it. Instead, appellants contend *Davis* was wrongly decided because, to the extent it was based on statutory law, it departed from the only equitable remedies expressly permitted by articles 7.05 and 7.06 of the Business Corporation Act—appointment of a receiver either for liquidation or rehabilitation of a corporation. As explained above, we reject this argument based on the text of article 7.05 and the logic underlying the holdings in *Patton* and *Davis*.[17]

Appellants imply that this Court has refused to recognize a buyback of stock as an available remedy for shareholder oppression. Appellants' brief states that "[i]n contrast [to the holding in *Davis v. Sheerin*], this Court's only statement regarding the remedies for oppression faithfully tracks Article 7.05's plain language," citing to our opinion in *Davis v. Davis*, No. 05–95–01813–CV, 1996 WL 200935, at *1 (Tex.App.-Dallas April 17, 1996, no writ) (not designated for publication). This statement is accurate but misleading for two reasons. First, the availability of a buyback was not an issue in *Davis v.*

*Davis. See id.* Second, what we said in *Davis v. Davis*, in full, was:

> In an action by a shareholder, when it is established that the corporation is insolvent or in imminent danger of insolvency or where the acts of *the directors or those in control of the corporation* are illegal, *oppressive,* or fraudulent, a receiver may be appointed to conserve the assets and business of the corporation and to avoid damage to the parties at interest. TEX. BUS. CORP. ACT ANN. art. 7.05(A)(1)(a), (c) (West 1980). All other requirements of the law must be complied with and *the court must determine that all other remedies available at law or in equity are inadequate. Id.*

*Id.* (emphasis added). Thus, our language in *Davis v. Davis* "faithful[ly] tracking" article 7.05 is fully consistent with our holding today.

Appellants refer us to *Brodie v. Jordan*, 447 Mass. 866, 857 N.E.2d 1076 (2006), in support of their argument that "the proper response to oppression is the rehabilitative remedy of an Article 7.05 receivership—not a court-ordered divorce in the form of a buy back."[18] In that case the Massachu-

16. *See In re White*, 429 B.R. 201, 215–18 (Bankr.S.D.Tex.2010); *DeBord v. Circle Y of Yoakum, Inc.*, 951 S.W.2d 127, 134 (Tex.App.-Corpus Christi 1997), *rev'd on other grounds sub nom. Stary v. DeBord*, 967 S.W.2d 352 (Tex.1998) (per curiam); *see also Hoggett v. Brown*, 971 S.W.2d 472, 488 n. 13 (Tex.App.-Houston [14th Dist.] 1997, pet. denied); *Christians v. Stafford*, No. 14–99–00038–CV, 2000 WL 1591000, at *2 (Tex.App.-Houston [14th Dist.] Oct. 26, 2000, no pet.) (not designated for publication). It also appears the issue of a court's authority to order a buyout was raised but not reached in *Willis*. *See Willis*, 997 S.W.2d at 801 & n. 1.

17. Appellants also argue that a buyout is unavailable under Texas law based on language from *Patton* concerning the Business Corporation Act's approach of rehabilitation in preference to dissolution or liquidation. *See Pat-*

ton, 279 S.W.2d at 854. They urge that a "buy back achieves neither rehabilitation nor a chance to 'normalize' the parties' relationships—it is a court-ordered divorce that forecloses any chance of normalization." However, *Patton* itself stated that in appropriate circumstances, a receivership for purposes of liquidation—clearly a remedy more drastic than a buyout and one which precludes the normalization of relationships between the shareholders—was available, albeit under the common law. *See id.* at 856–57. We find nothing in *Patton* upon which to hold that, despite the language in article 7.05(A), a Texas court cannot remedy shareholder oppression by ordering the offending parties to buy out an aggrieved minority shareholder.

18. Appellants also argue that receivership is too harsh a remedy, and that as Ann sought

setts supreme court reviewed a judgment ordering the defendants to purchase the plaintiff's stock at a price equal to her share of the corporation's net assets, as valued by an expert. *Id.* at 1081. The court first observed that one of the "defining aspects of a close corporation is 'the absence of a ready market for corporate stock.'" *Id.* (citation omitted). Second, the court noted that "there is nothing in the background law, the governing rules of this particular close corporation, or any other circumstance that could have given the plaintiff a reasonable expectation of having her shares bought out." *Id.*[19] Thus, the court reasoned that the judgment placed the plaintiff in a significantly better position than she would have enjoyed absent the wrongdoing. *Id.* On that basis, it reversed the judgment and remanded the case for the trial court to consider other remedies. *Id.* at 1082.

Massachusetts law differs from that of Texas in at least one relevant, significant way. As *Brodie* noted, unlike many other states where a buyout is an appropriate remedy for majority shareholder misconduct, under Massachusetts law "minority shareholders have no statutory right to involuntary dissolution of a corporation due to majority misconduct." *Id.* at 1082 n. 7. On this basis, the court declined to infer that Massachusetts courts have the power to order a buyout. *Id.* In contrast to Massachusetts and as discussed above, such a remedy is available under Texas law. *See* TEX. BUS. CORP. ACT arts. 7.05

(permitting appointment of receiver to rehabilitate corporation for misconduct of directors or controlling persons), 7.06(A)(3) (permitting liquidation of corporation in receivership if no feasible plan for remedying the condition has been presented within twelve months after appointment of receiver). Thus, the legal framework in which *Brodie* was decided is different from that existing here.

Additionally, the outcome in *Brodie* flows from the conclusion that the trial court's remedy—forced buyout of the minority shareholder's stock for a price based on her share of the corporation's net assets as valued by a court-appointed expert—placed the plaintiff in a significantly better position than she would have enjoyed absent the wrongdoing. *Id.* at 1081. We discuss herein whether this particular judgment shares that defect. However, we reject appellants' argument, based on *Brodie*, that as a matter of law a buyout can never be an appropriate remedy for shareholder oppression in Texas.

Lastly, appellants assert that "Ann abandoned her receivership claim in the trial court and did not file her own appeal seeking a receivership." To the extent appellants are arguing the trial court lacked authority to order a buyout of the Stock *without* appointing a receiver, they failed to preserve that argument by objection, *see* TEX.R.APP. P. 33.1(a), and indeed made the opposite argument to the trial court.[20]

---

only those two remedies, she is entitled to no relief at all.

**19.** The lack of a reasonable expectation is based on the principle that absent an agreement or provision in the corporation's organizational documents, there is no obligation on the corporation or the majority shareholders to buy the stock of the minority shareholders when the minority desire to sell their interest.

*Brodie,* 857 N.E.2d at 1081 (quotation omitted).

**20.** In their response to Ann's motion for judgment, appellants argued that the trial court could not appoint a receiver *and* order a buyout: "Plaintiff's pleading supports either a buy back or, if the Court determine [sic] buy back is not appropriate, the appointment of a receiver. Plaintiff's pleading does not sup-

■ As the Texas supreme court stated in *Patton*, "[w]isdom would seem to counsel tailoring the remedy to fit the particular case" of shareholder oppression. *Patton*, 279 S.W.2d at 857. We agree and conclude that Texas law authorizes the trial court, in an appropriate case, to order a buyout of an oppressed minority shareholder as an equitable remedy for shareholder oppression. We reject appellants' argument to the contrary.

## C. Was Appellants' Conduct Concerning Ann's Efforts to Sell the Stock Oppressive?

We now arrive at the heart of the case. The trial court concluded that Paula, Ritchie, Lutes, and RIC acted oppressively toward Buddy's Trust by, among other things, refusing to cooperate with Ann's attempts to sell the Stock to a third party. Appellants assert that their alleged conduct was not oppressive.

### 1. Applicable Law

■ Statutes like article 7.05 providing remedies for oppression rarely define the term. *See Davis*, 754 S.W.2d at 381. The term is expansive and covers a multitude of situations dealing with improper conduct; thus a narrow definition would be inappropriate. *Id.* Texas courts have generally recognized two non-exclusive definitions for shareholder oppression:

1. majority shareholders' conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder's decision to join the venture; or
2. burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a

violation of fair play on which each shareholder is entitled to rely.

*Willis*, 997 S.W.2d at 801 (citing *Davis*, 754 S.W.2d at 381–82); *see also Redmon v. Griffith*, 202 S.W.3d 225, 234 (Tex.App.-Tyler 2006, pet. denied) (quoting *Willis*); *Pinnacle Data Servs., Inc. v. Gillen*, 104 S.W.3d 188, 196 (Tex.App.-Texarkana 2003, no pet.) (same). These definitions are not mutually exclusive; depending on the facts of the case, conduct could be oppressive under either or both definitions. *See Scott v. Trans–Sys., Inc.*, 148 Wash.2d 701, 64 P.3d 1, 6 (2003); *Gimpel v. Bolstein*, 125 Misc.2d 45, 477 N.Y.S.2d 1014, 1019 (N.Y.Sup.Ct.1984).

■ The jury determines what acts occurred (assuming those facts are in dispute), but whether those acts constitute shareholder oppression is a question of law for the court. *See Willis*, 997 S.W.2d at 801; *Davis*, 754 S.W.2d at 380. And like other questions of law, the trial court's determination of that issue is subject to de novo review. *See J.M. Davidson, Inc.*, 128 S.W.3d at 239.

In deciding whether conduct rises to the level of oppression, courts must exercise caution, balancing the minority shareholder's reasonable expectations against the corporation's need to exercise its business judgment and run its business efficiently. *See Willis*, 997 S.W.2d at 801 (recognizing that "a corporation's officers and directors are still afforded a rather broad latitude in conducting corporate affairs"). However, as the *Davis* court observed, "Courts take an especially broad view of the application of oppressive conduct to a closely[ ]held corporation, where oppression may more easily be found." *Davis*, 754 S.W.2d at 381.

### 2. Necessity of Majority Shareholder

port an order providing her with both reme-

dies." (Citation omitted.)

Appellants assert the trial court's judgment should be reversed and judgment rendered for them because shareholder oppression can only be committed by a majority shareholder, and it is undisputed that there is no majority shareholder in RIC. Appellants cite two authorities in support of their argument—article 7.05 and *Allchin v. Chemic, Inc.*, No. 14–01–00433–CV, 2002 WL 1608616, at *7 (Tex. App.-Houston [14th Dist.] July 18, 2002, no pet.) (not designated for publication). Neither is persuasive.

■ Article 7.05 authorizes equitable intervention when "the acts of the *directors or those in control of the corporation* are illegal, oppressive or fraudulent." TEX. BUS. CORP. ACT ANN. art. 7.05(A)(1)(c) (emphasis added). This text clearly indicates shareholder oppression claims may be brought against "directors or those in control of the corporation." *Id.* This negates the argument that the absence of a majority shareholder is a bar to such claims.

Appellants' other cited authority, *Allchin*, is a non-published opinion[21] that stands only for the proposition that a plaintiff alleging shareholder oppression cannot be a fifty percent shareholder, a matter we need not address directly. *See Allchin*, 2002 WL 1608616, at *7.

■ The evidence is undisputed that Paula, Ritchie, and Lutes together control, either through direct ownership or by virtue of their positions as trustees of the shareholder trusts, 73.7 percent of the voting stock.[22] The evidence is undisputed these three persons were also three of RIC's four directors and that Paula's daughter, Gretchen Chrane, has held the fourth seat since 2003. There was also testimony that Paula, Ritchie, and Lutes had never disagreed on any issue at a shareholders meeting or on any action as directors.[23] Thus, the record establishes that appellants are both "directors" and "those in control of the corporation." TEX. BUS. CORP. ACT ANN. art. 7.05(A)(1)(c). We reject appellants' argument that there can be no shareholder oppression absent a single, majority shareholder.

### 3. Oppressive Conduct

#### a. Reasonable Expectations

As noted above, one of the definitions of shareholder oppression is "majority shareholders' conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder's decision to join the venture...." *Willis*, 997 S.W.2d at 801. Commentators have classified the "reasonable expectations" of shareholders into two broad categories: specific reasonable expectations and general reasonable expecta-

21. *Allchin* is an opinion of a sister court of appeals and was issued before January 1, 2003, without being designated for publication; accordingly, it has no precedential value. *See* TEX.R.APP. P. 47.7(b); *Satterfield v. Crown Cork & Seal Co.*, 268 S.W.3d 190, 206 n. 17 (Tex.App.-Austin 2008, no pet.) (court of appeals is not bound to follow decision of another court of appeals).

22. *See* 1 AMERICAN LAW INSTITUTE, PRINCIPLES OF CORPORATE GOVERNANCE § 1.10(a) (1994) ("A 'controlling shareholder' means a person ... who, either alone or pursuant to an arrange-

ment or understanding with one or more other persons: (1) Owns and has the power to vote more than 50 percent of the outstanding voting equity securities ...; or (2) Otherwise exercises a controlling influence over the management or policies of the corporation....").

23. Stasen testified he met with Ritchie, Paula, and her children and they made it clear that management of RIC would not meet with potential buyers of the Stock.

tions.[24]

■ Specific reasonable expectations are those specifically agreed to or expected as part of the transactions forming a particular corporation or that may develop over time among the shareholders of a particular corporation. Thus, specific reasonable expectations require proof of specific facts giving rise to the expectation in a particular case and that the expectation was reasonable under the circumstances and central to the decision to join the venture.[25] Examples of possible specific reasonable expectations are employment in the corporation or a say in management.[26]

■ However, general reasonable expectations are expectations that arise from the mere status of being a shareholder.[27] These expectations belong to all shareholders and thus, absent evidence to the contrary, are both reasonable under the circumstances and central to the decision to invest in the corporation.[28] Some exam-

---

24. *See* Douglas K. Moll, *Shareholder Oppression & Reasonable Expectations: Of Change, Gifts, and Inheritances in Close Corporation Disputes*, 86 MINN. L. REV. 717, 765–77 (2002) [hereinafter Moll, *Shareholder Oppression*].

25. Moll, *Shareholder Oppression* at 767 ("[A] specific reasonable expectation refers to an individually tailored investment bargain between a majority shareholder and a particular minority shareholder for employment, management, or some other benefit—a benefit beyond a proportionate stake in the company's earnings—that the minority shareholder will receive in return for its commitment of capital. Thus, unlike a status-triggered general reasonable expectation, a specific reasonable expectation is not held by every close corporation participant who can be characterized as a 'shareholder.' To the contrary, a specific reasonable expectation is personal in nature, as it requires proof that a close corporation majority shareholder and a particular minority shareholder reached a mutual understanding about a certain entitlement the minority is to receive in return for its investment in the business.").

26. 1 F. HODGE O'NEAL & ROBERT B. THOMPSON, O'NEAL'S CLOSE CORPORATIONS § 1.08, at 32 (3d ed. 1996) ("Even if shareholders in a close corporation anticipate an ultimate profit from the sale of shares, they usually expect (or perhaps should expect) to receive an immediate return in the form of salaries as officers or employees of the corporation rather than in the form of dividends on their stock."); Robert B. Thompson, *The Shareholder's Cause of Action for Oppression*, 48 BUS. LAW. 699, 702 (1993) ("Shareholders in a close corporation usually expect employment and a meaningful role in management, as well as a return on the money paid for the shares. Further, their expectations often are complicated by family or other personal relationships within the corporation.") (footnotes omitted). *But see Willis*, 997 S.W.2d at 803 (concluding a minority shareholder's expectation of continued employment without an employment contract was not objectively reasonable).

27. Douglas K. Moll, *Reasonable Expectations v. Implied–in–Fact Contracts: Is the Shareholder Oppression Doctrine Needed?*, 42 B.C. L. REV. 989, 1026 (2001) ("Just as in a public corporation, of course, the status of 'shareholder' entitles an investor to such benefits as a proportionate share of the corporate earnings (e.g., a proportionate share of the dividends, if declared), a right to any stock appreciation, a right to inspect company books and records (with a proper purpose), a right to vote on shareholder issues, and a right to be recognized as a shareholder.") [hereinafter Moll, *Implied–in–Fact Contracts*].

28. *See* Moll, *Implied–in–Fact Contracts, supra,* at 1026; Douglas K. Moll, *Shareholder Oppression v. Employment at Will in the Close Corporation: The Investment Model Solution*, 1999 U. ILL. L. REV. 517, 553–54 (1999) ("Under this framework, a distinction must be drawn between 'general' reasonable expectations and 'specific' reasonable expectations. Every shareholder reasonably expects that her commitment of capital entitles her to a proportionate share of the corporate earnings. Oppression liability should arise, therefore, whenever this 'general' reasonable expectation is frustrated—i.e., whenever controlling shareholders squeeze-out a minority shareholder from the business returns but continue to share in the corporate earnings themselves.") (footnotes omitted) [hereinafter Moll, *Employment at Will*].

ples of general reasonable expectations are the right to proportionate participation in earnings, the right to any stock appreciation, the right (with a proper purpose) to inspect corporate records, and the right to vote if the stock has voting rights.[29]

■ One of the general reasonable expectations of any property owner—including the owner of stock in a corporation—is the right of free alienation of that property.[30] For this reason, the usual policy of the law opposes restraints on the alienation of personal property, including stock. *See Tenneco, Inc. v. Enter. Prod. Co.*, 925 S.W.2d 640, 646 (Tex.1996) ("Sound corporate jurisprudence requires that courts narrowly construe rights of first refusal and other provisions that effectively restrict the free transfer of stock."); *Dixie Pipe Sales, Inc. v. Perry*, 834 S.W.2d 491, 493 (Tex.App.-Houston [14th Dist.] 1992, writ denied). Absent valid restrictions, the general rule applies and unrestricted shares are freely transferable. *Sandor*

*Petroleum Corp. v. Williams*, 321 S.W.2d 614, 617 (Tex.Civ.App.-Eastland 1959, writ ref'd n.r.e.) ("Generally speaking, corporate shares of stock are property which may be freely sold and delivered.").[31]

■ Thus, one of the general reasonable expectations of a shareholder whose stock contains no restrictions on its alienation, and whose rights are not otherwise limited or qualified by contract, is that she is free to sell her stock to a party of her choosing at a mutually acceptable price. *See Thompson v. Hambrick*, 508 S.W.2d 949, 953–54 (Tex.Civ.App.-Dallas 1974, writ ref'd n.r.e.) (stating general rule, citing *Seagrave Corp. v. Mount*, 212 F.2d 389, 395 (6th Cir.1954) (stating general rule as applicable to majority shareholders)). This is true even if the stock is that of a closely held corporation.

Although it does not deal specifically with shareholder oppression, the *Sandor* case provides a useful illustration of the general reasonable expectations of a hold-

---

29. *See* Moll, *Implied–in–Fact Contracts, supra,* at 1026. These categories, while helpful, are not rigid. For example, if in a particular closely held corporation the corporate earnings are distributed in the form of salary and employment benefits rather than dividends, continued employment could be a general reasonable expectation of all shareholders because employment is the means by which they share in the corporation's earnings. *See* Moll, *Employment at Will, supra,* at 553–54 ("When close corporation employment is at issue, the general reasonable expectation inquiry is designed to identify whether a job is part of a shareholder-employee's investment in a de facto dividend sense. Indeed, as mentioned, when a job is providing de facto dividends, a termination will often exclude the discharged investor from his share in the corporate earnings. Such a termination frustrates the general reasonable expectation and should give rise to oppression liability.").

30. *See* Tex. Const. art. I, § 26 interp. commentary (West 2007) ("The framers of the Texas Constitutions, beginning with that of the Re-

public, have believed in an unrestrained power to convey or transfer property, and thus have written into the Bill of Rights this provision against perpetuities, primogeniture and the entailment of estates."); *Hicks v. Castille*, 313 S.W.3d 874, 881–82 (Tex.App.-Amarillo 2010, pet. denied) (alienability is a legal incident of property).

31. Reasonable restrictions on the transfer of corporate stock are recognized as valid if they do not violate public policy. *See Dixie Pipe,* 834 S.W.2d at 493; *see also* Tex. Bus. Orgs. Code Ann. § 21.209 (West 2010) ("Except as otherwise provided by this code, the shares and other securities of a corporation are transferable in accordance with Chapter 8, Business & Commerce Code."); *id.* §§ 21.210–.213 (stating manner of creating restrictions and listing examples of valid restrictions on transfer of shares); Tex. Bus. & Com.Code Ann. § 8.204 & cmt. 1 (West 2011) (validity of restriction determined by other law, but any restriction on transfer must be noted conspicuously on certificate if certificated security to be enforceable).

er of unrestricted stock. In that case, a corporation was organized by Williams and three others. The corporation issued unrestricted stock to Williams for valuable consideration. *Sandor*, 321 S.W.2d at 616–17. When a dispute over management arose between Williams and another shareholder, Williams offered his stock for sale. *Id.* The other three shareholders (who were also directors) then adopted a new bylaw containing restrictions on the transfer of stock, canceled Williams's unrestricted share certificates, and issued him new share certificates containing the newly adopted transfer restrictions. *Id.* Williams rejected the new certificates and sued the corporation and the other shareholders for conversion of his stock. *Id.*

The court in *Sandor* recognized Williams owned the stock free of any restriction on transfer and "[h]is ownership of the stock and his right to sell or transfer it was a vested right and interest, subject only to the right of the corporation to manage and regulate its affairs under the laws of this state and under the provisions of its charter and bylaws." *Sandor*, 321 S.W.2d at 617. The court rejected the argument that newly adopted transfer restrictions could be imposed on existing unrestricted stock, explaining that "[s]uch a restriction on previously unrestricted stock would unreasonably restrain and prohibit its sale and transfer and could result in depriving the owner of the full value of his stock." *Id.* at 618. The court concluded the corporation's right to manage its affairs did not include the right to adopt policies that impair the vested rights of holders of unrestricted stock to seek to sell their stock:

> Williams had a vested property right in the value of his stock. The right of the corporation to regulate and to manage its affairs does not include the power to impair that vested contractual right and to take from holders of unrestricted stock the value of their stock. The amended bylaw of the Sandor Petroleum Corporation so restricting the sale of its previously unrestricted stock was, therefore, unauthorized and invalid in so far as it denied appellee's right to sell at a price which he could have secured on the open market.

*Id.* at 618–19.

■ Despite the general reasonable expectation of being able to sell unrestricted shares at a mutually acceptable price, often no ready market exists for the stock in a closely held corporation, especially if it represents a non-controlling, minority interest.[32] In that context, unless the minority shareholder reaches an agreement to sell her stock back to the closely held corporation or to someone already involved in its ownership or management,[33] to sell her stock she must market it to third parties. Because often no ready market exists, to sell her stock to third parties she must market her stock by (1) identifying potential third-party buyers through means such as advertising, networking through brokers and others, and meeting with potential buyers, and then (2) provid-

---

32. *See* Thompson, *supra*, at 702 n. 23 (noting the lack of a ready market precludes reliance on the stock market to monitor managers and precludes the ability of uninformed investors to rely upon the efficient market to set price instead of engaging in their own costly search for information) (citing FRANK H. EASTERBROOK & DANIEL R. FISCHEL, THE ECONOMIC STRUCTURE OF CORPORATE LAW 230–31 (1991)).

33. Often the parties most interested in acquiring the minority shareholder's interest in a closely held corporation are the corporation itself or its other shareholders. However, generally—as is the case here—they have no obligation to offer to purchase, purchase, or market the minority shareholder's stock absent a valid restriction on transfer. *See* TEX. BUS. ORGS. CODE ANN. §§ 21.209–.213.

ing to those potential buyers sufficient information about the corporation and its businesses, assets, and management as to allow them to conduct a reasonable investigation as to the proposed transaction. Corporate policies that constructively prohibit the shareholder from performing these activities would substantially defeat the shareholder's general reasonable expectation of being able to market her unrestricted stock.

### b. Fair Dealing

■ The second definition for shareholder oppression is "burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely." *Willis*, 997 S.W.2d at 801. This definition focuses more on the conduct of the directors or those in control of the corporation than on the reasonable expectations of the minority shareholder. The standards of fair dealing with respect to the owner of unrestricted stock in a corporation would include a requirement that they act fairly and reasonably in connection with a shareholder's efforts to sell that stock to a third party and not adopt policies that unreasonably restrain or prohibit the sale or transfer of the stock or that deprive the owner of its fair market value. *See Sandor*, 321 S.W.2d at 618.

■ The second definition of shareholder oppression will often overlap the reasonable expectations definition because the standards of fair dealing on which all

shareholders are entitled to rely will often include conduct necessary to meet the reasonable expectations of shareholders. Thus, conduct of the directors or those in control of the corporation that substantially defeats the reasonable expectations of a minority shareholder will often constitute conduct that is "burdensome, harsh, or wrongful," or that constitutes "a lack of probity and fair dealing in the company's affairs" or "a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely." *See Willis*, 997 S.W.2d at 801. Under either definition, oppressive conduct does not require a showing of fraud, illegality, mismanagement, wasting of assets, or deadlock, although these factors are often present.[34]

### c. Application

In this case, there are no restrictions on the sale of the Stock to third parties.[35] Thus Ann, even as a minority shareholder in a closely held corporation, had a general reasonable expectation that she could market the Stock to third parties at whatever price the market would bear. Because a holder of unrestricted stock in a closely held corporation has a general reasonable expectation of being able to market her stock to third parties, it is also reasonable to expect that the corporation and its management (as part of the standards of fair dealing on which all shareholders are entitled to rely) will consent to a shareholder's reasonable requests for cooperation with respect to her efforts to sell the stock.

---

34. *Davis*, 754 S.W.2d at 381–82. Oppression is an independent basis for relief. *See* TEX. BUS. CORP. ACT ANN. art. 7.05(A)(1)(c) (allowing relief for acts that are "illegal, oppressive or fraudulent").

35. There is no evidence RIC had a bylaw or an agreement restricting a shareholder's ability to sell its stock. Although RIC offered to buy the Stock for $1 million cash (and later for $1.7 million cash and debt), Ann had the legal right to reject those offers and seek another purchaser, which she did.

Stasen testified that one of the regular, necessary steps in the due-diligence investigation of any prospective investor in a closely held corporation is a meeting with the corporation's management. As he testified—again, in the context of a closely held corporation—"No investor would ever invest in anything without meeting the management." However, appellants flatly refused to meet with—or allow RIC management to meet with—any prospective purchasers. Ritchie unequivocally told Ann that "it would be inappropriate for me or any other officer or director of [RIC] to meet with your prospects or otherwise participate in any activities relating to your proposed sale of stock." Ritchie testified he refused to speak to potential purchasers of the Stock. Stasen also testified to Ritchie's refusal to meet with potential purchasers. Stasen testified that Ritchie and RIC's refusal to meet potential purchasers of the Stock deterred several potential investors. He stated he was unable to sell the Stock because investors could not make a decision without meeting the executives of RIC.

■■■■■ Appellants argue that Ann waived their refusal to meet with potential purchasers as a basis for shareholder oppression because no question about that conduct was submitted to the jury. We reject appellants' argument because uncontroverted issues need not be submitted to the jury. *City of Keller v. Wilson,* 168 S.W.3d 802, 814–15 & n. 52 (Tex.2005).

"No jury finding is necessary to establish undisputed facts." *Id.* (quoting *Wright v. Vernon Compress Co.,* 156 Tex. 474, 296 S.W.2d 517, 523 (1956)). Ritchie admitted, and put in writing, his refusal to speak with potential purchasers. No witness testified that Ritchie or any other member of management agreed to meet or did meet any potential purchasers of the Stock.[36] Accordingly, this fact was conclusively established and did not require a jury finding. *See* Tex.R. Civ. P. 279 (independent grounds of recovery are not waived if conclusively established).

Appellants next assert their conduct as directors that the trial court found to be oppressive was protected from liability by the business judgment rule. We address this argument only in the context of the trial court's conclusion that appellants engaged in oppressive conduct by refusing to cooperate with Ann's attempts to sell the Stock to a third party.

■■■■■ The business judgment rule protects a corporation's directors from personal liability to shareholders for their actions in operating the corporation unless their actions are ultra vires or tainted by fraud. *See Gearhart Indus., Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 721 (5th Cir.1984). However, this is not a derivative suit for breach of the duty of care owed to the corporation. Further, the directors of RIC were not held personally liable for the shareholder oppression; nor were the di-

**36.** Paula agreed that it would be oppressive for Ritchie not to meet with potential buyers, but testified she "was not sure that that's what happened." She also testified (non-responsively) to another question by stating "that didn't happen." Viewing her answers together, and in light of Ritchie's own testimony and fax stating he refused to meet with potential buyers and Stasen's testimony to the same end, we conclude Paula's testimony to be nothing more than speculation, which constitutes no more than a scintilla of evidence that Ritchie did not refuse to meet with potential investors and thus insufficient to raise an issue of fact on that matter. Evidence that is "so weak as to do no more than create a mere surmise or suspicion" of a fact is no evidence. *Jelinek v. Casas,* 328 S.W.3d 526, 532 (Tex. 2010) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)); *see also City of Keller,* 168 S.W.3d at 820 ("[Fact-finders] are not free to believe testimony that is conclusively negated by undisputed facts.").

rectors or those controlling the corporation directed to buy the Stock themselves. Instead, the trial court's judgment ordered them as directors of RIC and trustees of a majority interest of the shareholders to cause RIC to redeem the Stock. Accordingly, the business judgment rule has no application in this case.[37]

Appellants also contend their conduct was protected by a doctrine similar to the business judgment rule incorporated into the definition for oppression under article 7.05. *See Willis,* 997 S.W.2d at 801 (referring to need for balancing minority shareholders' reasonable expectations against corporation's need to exercise business judgment). Ritchie testified that he refused to speak to prospective purchasers and directed the rest of RIC's management not to speak to them because of concerns that any statements management made could result in lawsuits by the purchasers. Lutes also testified it would have been possible for Ritchie to meet with outside investors, but that such a meeting might put the corporation at risk of becoming involved in litigation with third parties.

 However, the corporation's interest in managing its affairs—or to minimize the possibility of litigation—does not include the right to "substantially defeat" the reasonable expectation of a minority shareholder that she can effectively market her unrestricted stock in the corporation, *see Willis,* 997 S.W.2d at 801, or the right "to take from holders of unrestricted stock the value of their stock." *See Sandor,* 321 S.W.2d at 618–19. Moreover, Paula testified that she would disagree

with Ritchie's decision not to meet with prospective investors and that she believed Ritchie's decision would have been oppressive. Likewise, Lutes testified it was reasonable for Ann to expect that RIC would help her, to the extent possible, sell the Stock to outside parties.

As discussed below, there are several means by which the corporation can protect itself from litigation short of a flat refusal to meet with potential buyers. Applying the definitions of shareholder oppression and balancing the minority shareholder's general reasonable expectations against the corporation's need to exercise business judgment to these facts, we cannot conclude the corporation's desire to avoid any possibility of litigation outweighed Ann's general reasonable expectation of marketing the Stock. Further, other than a general and nonspecific fear of litigation with third parties, appellants do not argue any other justification supporting their contention that their refusal to meet—or allow RIC management to meet—with prospective purchasers of the Stock constitutes a legitimate exercise of business judgment of such necessity as to outweigh the substantial negative effects of their actions on Ann's efforts to sell the Stock.

 Under the uncontroverted facts of this case, we conclude appellants acted oppressively toward Ann by refusing to meet or allow any officer or director of RIC to meet with prospective purchasers of the Stock because that conduct in this case substantially defeated Ann's general reasonable expectation of marketing the Stock.[38] We further conclude that the re-

---

37. Appellants also assert the refusal to meet with potential purchasers was based on advice of counsel; however, they cite no authority that reliance on advice of counsel is an absolute defense to claims of shareholder oppression.

38. Although RIC had a history of paying dividends to its shareholders, we cannot say that Ann's decision to forgo those dividends and seek a return on the investment through a sale of the Stock at fair market value was unreasonable.

fusal to meet with potential purchasers of the Stock was oppressive because it was "a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely." *Willis,* 997 S.W.2d at 801.[39]

■ In reaching this conclusion, we recognize that the rights of the minority shareholder and the concomitant obligations of the directors or those in control of the corporation are not unlimited. Under the definitions of shareholder oppression, they are limited to such requests and responses necessary to avoid (1) conduct by majority shareholders that "substantially defeats" the minority shareholder's general reasonable expectations (and, if proven, any specific reasonable expectations), as well as (2) conduct that is "burdensome, harsh, or wrongful," or that constitutes "a lack of probity and fair dealing in the company's affairs" or "a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely." *Id.*

For example, and in the context of a minority shareholder's efforts to sell her stock, the majority shareholders, directors, or those in control of the corporation need not seek potential purchasers for the minority shareholder's stock or otherwise market the stock on her behalf. They need not agree to requests that would unduly disrupt or affect the operation of the business or intrude into issues reserved for corporation's officers and directors. And a shareholder cannot request the corporation's management to speak or act in a manner that would tend to inflate the value of the stock and the corporation, and the shareholder may not request that management mislead potential investors.

■ Further, reasonable restrictions on the access to and use of business information or property, depending on the nature of the business, will normally be acceptable. Thus, the corporation's management may place reasonable limitations on the corporation's cooperation, including limiting the time spent with potential investors and requiring them to sign confidentiality agreements that protect the company's interests while permitting reasonable due-diligence. However, they cannot act in such a way as to substantially defeat the minority shareholder's right to sell her stock to a third party. *See Willis,* 997 S.W.2d at 801.

We need not opine on the outer limits of what conduct was necessary to avoid substantially defeating Ann's reasonable expectation of marketing the Stock. Here, appellants flatly refused Ann's request that management meet with potential purchasers of the Stock. On its face, this request did not intrude into issues reserved for the directors and officers. There is no evidence the request materially affected the operation of the business or was unreasonable in any other manner. And, most importantly, there is substantial evidence that refusing Ann's request to meet with potential purchasers had the practical effect of precluding her from the opportunity to market the Stock to third parties.

### D. Is the Buyout Remedy an Abuse of Discretion as "Unduly Harsh"?

Appellants next assert that, even if Texas law authorizes a buyout as a remedy for

---

39. We do not conclude, however, that appellants oppressed Ann by making the offers to buy the Stock. As Ann admitted in her responses to appellants' request for admissions, appellants had no contractual obligation to repurchase the Stock, and Ann presented no evidence that appellants had any noncontractual obligation to repurchase the Stock. Because Ann refused the offers, she was in no worse position as a result of the offers than if the company had refused Ann's request to repurchase the Stock.

shareholder oppression, that remedy is inappropriate here because it is "unduly harsh" under the circumstances, and thus the trial court abused its discretion in imposing such a remedy. As noted earlier, the trial court's decision in fashioning equitable relief is reviewed under an abuse of discretion standard. *See Wagner & Brown, Ltd.*, 282 S.W.3d at 428–29; *Edwards*, 252 S.W.3d at 836.

> Appellants argue that
>
> [t]his unduly harsh "remedy" will force RIC to sell and/or leverage corporate assets to scrape together over $7.3 million for the stock, leaving it vulnerable to the vicissitudes of a collapsing economy.... In short, [the trial court] concluded that RIC should be brought to its knees and placed at risk of bankruptcy to appease Ann.

In support of their argument, appellants again cite *Brodie* (the Massachusetts supreme court case) as well as language in *Davis*. *See Brodie*, 857 N.E.2d at 1081–82; *Davis*, 754 S.W.2d at 380.

Appellants' brief also references a motion they filed with the trial court to set the amount and type of security to supersede the judgment, as well as an affidavit by Ritchie filed in support of that motion. In that motion, appellants asked the trial court to set the amount of security necessary to supersede the judgment at no more than $4 million, stating that having to post security of $7.3 million would destroy RIC. Appellants' motion did not challenge the trial court's judgment and did not argue—as appellants do here—that the alleged negative effects on RIC of having to buy the Stock entitled them to a rendition of judgment in their favor. Accordingly, that motion did not preserve appellants' argument for review. *See* TEX.R.APP. P. 33.1(a).

Appellants also filed below—but do not cite in connection with this argument—a motion to modify the judgment that argued for imposition of remedies less harsh than a buyout of the Stock. That motion relied on another affidavit from Ritchie, in which he stated that to pay the judgment RIC would have to give up nearly all its working capital and cash reserves and liquidate one or more of its illiquid assets. He stated his opinion that this liquidation would take several months, result in a taxable gain to the corporation, and could possibly be made only at a "fire sale" price. He concluded that even if RIC could sell the assets within a year, payment of the judgment "would cripple RIC and cause substantial harm to RIC and its other shareholders." [40]

Ann counters appellants' argument by stating there was evidence RIC had net sales of over $152 million in 2007 and had $55 million in assets. She also points out that the trial court set the amount necessary to supersede the judgment at the amount of the judgment plus interest. The record indicates appellants posted a supersedeas bond in that amount.

Assuming their motion to modify the judgment was sufficient to preserve appellants' argument for appeal, based on the evidence and the record we cannot say that the trial court's order that appellants cause RIC to buy out the Stock as an equitable remedy for their oppressive con-

---

**40.** In their motion to modify the judgment, appellants also argued that remedies such as enjoining payments to Paula or putting Ann on the board of directors were less harsh than a buyout because they did not "require RIC to liquidate assets and diminish the value of the company as a whole." These suggested remedies might have been appropriate to remedy the other conduct found by the trial court to constitute oppression, but they do not address how to remedy appellants' oppressive conduct in refusing to meet with potential purchasers of the Stock.

duct in connection with Ann's efforts to sell the Stock was so harsh as to constitute an abuse of discretion. We reject appellants' argument to the contrary. *See Wagner & Brown, Ltd.*, 282 S.W.3d at 428–29; *Edwards*, 252 S.W.3d at 836.

### E. Conclusion

We conclude that a buyout is an available remedy for shareholder oppression under Texas law and that, under the circumstances, appellants' conduct in refusing to meet—or allow RIC management to meet—with prospective purchasers constituted oppressive conduct as to Ann. We also conclude that the trial court did not abuse its discretion in ordering appellants to cause RIC to buy the Stock as an equitable remedy for this oppressive conduct. To this extent, we overrule appellants' first issue. As a result, we need not consider whether the trial court erred in concluding that appellants' other conduct—standing alone or in conjunction with their conduct as a whole—was oppressive. *See* TEX.R.APP. P. 47.1. Thus, we also do not reach appellants' arguments attacking the propriety of the jury's findings or the trial court's findings of fact and conclusions of law concerning that other conduct. *See id.*

## IV. VALUATION OF THE STOCK

The jury was asked to find the "fair value" of the Stock. They were instructed that "fair value" meant the value of the Stock, determined:

a. As of June 30, 2006;

b. Using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and

c. Without discounting for lack of marketability or minority status.

In response, the jury found the Stock was worth $7.3 million. Based on this finding, the trial court ordered appellants to cause RIC to pay Ann $7.3 million for the Stock and for Ann to surrender the Stock to RIC. As a part of their first issue, appellants argue the trial court erred in ordering RIC to pay $7.3 million for the Stock because the Stock was wrongly valued.[41] They assert the trial court submitted the wrong date for the jury to determine the value and that the court erred in failing to discount the value for the Stock's lack of marketability and minority status and for "trapped-in capital gains tax liability."

### A. Date of Valuation

Appellants assert that "[t]he limited case law on this [date of valuation] issue requires that the value be calculated on the date of injury," citing *Pabich v. Kellar*, 71 S.W.3d 500 (Tex.App.-Fort Worth 2002, pet. denied). Instead of June 2006, appellants appear to argue that the appropriate date for valuing the Stock should be March 2003, the date of a "conversation between Lee and Ann in which he told her the other shareholders intended to nominate her to RIC's board."

The issue in *Pabich* was the determination of damages for fraud, breach of fiduciary duty, and tortious interference with a business relationship. *Id.* at 508. The court of appeals stated, "When calculating the value of stock in order to determine the *amount of damages* to award an injured party who had an ownership interest in the corporation, evidence of the value of the corporation at the time the alleged injury occurred is required." *Id.* at 509

41. Appellants' first issue asks this court to reverse and render the trial court's judgment. In connection with their valuation argument, however, they ask that the amount of the judgment be modified.

(emphasis added). The case before us, however, does not involve the award of damages caused by a defendant's tortious conduct. This case is about the award of equitable relief—not damages—to Ann as a remedy for appellants' oppressive conduct.

 Moreover, the date of a conversation concerning Ann's possible nomination to the board of directors is not germane to valuing the Stock in connection with the court-ordered buyout of the Stock as a remedy for appellants' oppressive conduct in connection with Ann's efforts to sell the stock to third parties. The record indicates that Ritchie refused Ann's request that he meet with potential buyers as late as his fax to her of February 1, 2006. Ann filed this suit on July 21, 2006. The June 30, 2006 valuation date was the date of RIC's last audited financial statements at the time Ann's expert prepared his report. Appellants do not contend the value of the Stock changed materially between February 1 and June 30, 2006; nor have they shown that it was inequitable for the trial court to value the Stock as of June 30, 2006 in order to fashion an equitable remedy for appellants' oppressive conduct in connection with Ann's efforts to sell the stock to third parties. Accordingly, we conclude appellants have not shown the trial court erred by using June 30, 2006 as the relevant date for determining the value of the Stock.

## B. Discounts of the Stock's Value

The trial court ordered RIC to redeem the Stock for "fair value," which the jury determined to be (as of June 30, 2006) $7.3 million without discounts for lack of marketability or minority status. Appellants assert the trial court erred by instructing the jury not to apply any discounts to the Stock's value. They contend the value of the Stock should include discounts for the lack of marketability and the minority status of the Stock.

Two types of "fair value" are enterprise value and fair market value. The enterprise value of stock is determined by the value of the company as a whole and ascribing to each share its pro rata portion of that overall enterprise value.[42] Enterprise value does not include a discount based on the stock's minority status or lack of marketability.[43] In contrast, "fair market value" of corporate stock has been defined as "the price at which the stock would change hands between a willing seller, under no compulsion to sell, and a willing buyer, under no compulsion to buy, with both parties having reasonable knowledge of relevant facts." *Fisher v. Yates*, 953 S.W.2d 370, 379 (Tex.App.-Texarkana 1997), *pet. denied*, 988 S.W.2d 730 (Tex. 1998) (per curiam).

Here, the jury's verdict as to the Stock's "fair value" constitutes their determination of "enterprise value," as they were instructed to value the stock "[w]ithout discounting for lack of marketability or minority status." The jury heard evidence from Donald and Richard Latin, who conducted a valuation of RIC and determined the value of the Stock was $7,377,000 to $8,922,000. The Latins testified their valu-

---

**42.** *See* Douglas K. Moll, *Shareholder Oppression and "Fair Value": of Discounts, Dates, and Dastardly Deeds in the Close Corporation*, 54 DUKE L.J. 293, 313 (2004) [hereinafter Moll, *Fair Value* ]; *see also Swope v. Siegel–Robert, Inc.*, 74 F.Supp.2d 876, 911 (E.D.Mo. 1999) (defining "enterprise value" "as the amount 'a willing buyer realistically would pay for the enterprise as a whole on the statutory valuation date' " (quoting *BNE Mass. Corp. v. Sims*, 32 Mass.App.Ct. 190, 588 N.E.2d 14, 19 (Mass.1992))), *rev'd on other grounds*, 243 F.3d 486 (8th Cir.2001).

**43.** *Swope*, 74 F.Supp.2d at 911.

ation did not include discounts for the lack of marketability and the minority status of the Stock. Thus the Latins' valuation sought to determine the enterprise value—not the fair market value—of the Stock.

Enterprise value has been seen as the appropriate valuation when a minority shareholder, with no desire to leave the corporation, has been forced to relinquish his ownership position by the oppressive conduct of the majority. *See* Moll, *Fair Value, supra,* at 319–20. In that situation, "[t]he oppressed minority investor was not looking to sell, and the oppressive majority investor, absent the threat of dissolution or other judicial sanction, was not looking to buy." *Id.* at 321 & n. 108. Likewise, enterprise value has been held to be the appropriate value for a shareholder dissenting to a merger: in that situation there is a willing buyer, but not a willing seller. *See Swope v. Siegel–Robert, Inc.,* 243 F.3d 486, 492–93 (8th Cir.2001). That, however, is not the situation in this case. Here, Ann desired to leave the corporation and sought to market the Stock, first to RIC and then to third parties.

In crafting an equitable remedy for appellants' oppressive conduct in connection with Ann's efforts to sell the Stock, the trial court should have provided the relief prevented by appellants' conduct, i.e., a sale at fair market value. If Ann had been able to sell to a willing buyer under no obligation to purchase, Ann would have obtained the "fair market value" of the Stock. As an equitable remedy for appellants' oppressive conduct, Ann is entitled to no more than that.

■ Two factors affecting the fair market value of the Stock are its lack of marketability and the fact that it represents a minority position in RIC. *See Swope,* 74 F.Supp.2d at 911; Moll, *Fair Value, supra,* at 324 n. 115. By expressly instructing the jury to exclude these factors in determining the "fair value" of the stock and by basing its equitable remedy on their determination, the trial court ordered appellants to pay Ann more than the fair market value of the Stock. Thus the trial court's judgment provided excessive relief for Ann. *See Brodie,* 857 N.E.2d at 1081 (concluding buyout remedy placed the plaintiff in a significantly better position than she would have enjoyed absent the wrongdoing).

However, we conclude the enterprise value of the Stock constituted some evidence of its fair market value. *Cf., e.g., Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 314 (Tex.2006) ("Unsegregated fees for the entire case are some evidence of what the segregated amount should be."). The record also contains some evidence of the discount for lack of marketability and minority status. Ritchie testified that the 46.3 percent Cromwell discount[44] was for lack of marketability and for minority status. Also, the report of Alan Tolmas (another appraiser Ann hired) examined several studies of lack of marketability and minority interest discounts and stated, "From these studies, certain generalizations can be implied. For example, the Lack of Marketability discounts for minority interest fall between 13%–45% and average approximately 29%." Donald Latin testified that an appropriate discount for lack of control would be between five and thirty percent, and an

---

**44.** The Cromwell Discount is named after Buddy's and Paula's cousin, Rex Cromwell, who was a minority shareholder in RIC. Shortly before his death in 1994, Cromwell sold his shares to RIC for book value minus 43.6 percent. The stated purpose of the discount was to account for the diminution of the fair market value of RIC's shares due to the lack of a ready market and due to the minority position they represented.

appropriate discount for lack of marketability would be thirty percent.

## C. Conclusion

We sustain the remaining part of appellants' first issue to the extent it challenges the trial court's order that RIC pay a price for the Stock that did not reflect its fair market value, which would include discounts for lack of marketability and for the Stock's minority position. We conclude the cause should be remanded to the trial court for further proceedings to determine the fair market value of the Stock. In all other respects, we overrule appellants' first issue.

Because the valuation of the Stock was erroneous due to the absence of discounts for lack of marketability and for the Stock's minority position, we need not reach appellants' argument that the value must be further discounted for "trapped-in capital gains tax liability," and we express no opinion on that issue.

## V. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Little remains of appellants' third issue, in which they make a global attack on the trial court's findings of fact and conclusions of law. To the extent not already addressed, we dispose of the remaining portions as follows.

Appellants challenge the jury's findings and the trial court's findings of fact and conclusions of law concerning whether appellants committed shareholder oppression and breached their fiduciary duties in ways other than the refusal to cooperate with Ann's efforts to sell the Stock to third parties. As noted above—and with one exception—we need not address these issues. *See* Tex.R.App. P. 47.1. The excep-

tion concerns appellants' arguments that the jury's finding and the trial court's conclusions regarding whether appellants caused RIC to withhold corporate books and records from Ann was contrary to the evidence. Those findings and conclusions are not necessary to support the trial court's award of equitable relief. However, they are relevant to the trial court's award of attorney's fees on appeal and are discussed below.

Appellants argue that the trial court's conclusions of law are "insupportable" because they did not designate the capacity in which appellants acted.[45] It is undisputed that the same individuals were both trustees of the trusts owning a majority of the voting stock of RIC and three of the four directors of RIC. Appellants do not explain why such designation was necessary, and they cite no authority showing the lack of designation was erroneous. We conclude this argument is not properly briefed and presents nothing for review. *See* Tex.R.App. P. 38.1(i).

Appellants assert that part of a conclusion of law setting out the definition of shareholder oppression should be disregarded because that part of the definition was not submitted to the jury. As discussed above, the jury does not decide whether an act is oppressive; that decision is one of law for the court. *See Willis,* 997 S.W.2d at 801; *Davis,* 754 S.W.2d at 380. Thus, the failure to include part of the definition in the jury charge does not affect the trial court's ability to consider the complete definition in making a ruling on an issue of law. Moreover, because whether appellants' conduct constitutes shareholder oppression is a question of law of the court, *see J.M. Davidson, Inc.,* 128 S.W.3d at 239, we do not see how the

---

**45.** We address this argument only in the context of the conclusion as to appellants' refusal to cooperate with the efforts to market the Stock to third parties.

subject of appellants' complaint could have resulted in an erroneous judgment.

We overrule the remainder of appellants' third issue.

## VI. ATTORNEY'S FEES

■ In their second issue, appellants contend the trial court erred in awarding conditional appellate attorney's fees to Ann. Generally, litigants cannot recover attorney's fees unless the recovery is authorized by statute or a contract between the parties. *See Intercontinental Grp. P'Ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 & n. 7 (Tex.2009); *New Amsterdam Cas. Co. v. Tex. Indus., Inc.*, 414 S.W.2d 914, 915 (Tex.1967). Ann asserted she was entitled to attorney's fees under article 2.44(D) of the Texas Business Corporation Act because RIC withheld its corporate books and records from Ann and her agents and did not allow them to make extracts of the books and records. Appellants assert there is no evidence RIC withheld its corporate books and records and did not allow Ann and her agents to examine and make extracts of them.

■ In determining an assertion that no evidence supports a jury finding, we review the evidence and must credit the favorable evidence if a reasonable juror could, and we must disregard the contrary evidence unless reasonable jurors could not. *City of Keller*, 168 S.W.3d at 823. A challenge to the legal sufficiency of the evidence will be sustained when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex.2006). Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004).

Before January 1, 2010, a shareholder's rights to review a corporation's books and records, and the shareholder's remedy for breach of those rights were controlled by article 2.44 of the Texas Business Corporation Act. Under article 2.44(C), a shareholder of at least five percent for at least six months had the right to review the corporation's books and records and make extracts therefrom for any proper purpose. TEX. BUS. CORP. ACT ANN. art. 2.44(C) (expired 2010).[46] Under article 2.44, any corporation that refused to allow a shareholder or his agent to examine and make extracts from its books and records for any proper purpose, "shall be liable to such shareholder for all costs and expenses, including attorneys' fees, incurred in enforcing his rights under this Article in addition to any other damages or remedy afforded him by law." *Id.* art. 2.44(D).

The jury found that RIC, acting by and through its officers and directors, failed to permit Ann or her agents to examine and make extracts of RIC's books and records.[47] The trial court's conclusions of law included, "Defendants failed to provide corporate books and records to [Ann] under § 2.44 of the Texas Business Corporation Act," and "[appellants] engaged in oppressive conduct ... by causing the corporation to withhold corporate books and records from Ann Rupe." The trial court's judgment awards attorney's fees to Ann "[i]n the event of an unsuccessful appeal

---

**46.** Act of May 7, 1993, 73d Leg., R.S., ch. 215, § 2.11, 1993 Tex. Gen. Laws 418, 448, *expired Jan. 1, 2010*, Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 2, 2003 Tex. Gen. Laws 267, 595 (now codified at TEX. BUS. ORGS. CODE ANN. § 21.218(b) (West 2010)).

**47.** The jury also found that Ritchie, Paula, and Lutes as directors of RIC (but not as trustees of the shareholder trusts) "engaged in oppressive conduct in making books and records of [RIC] available" to Ann or her representatives.

by [appellants]." [48] At various. points in their brief, appellants challenge these findings. They argue, among other things, that the evidence shows Ann was allowed to examine and make extracts from the corporation's books and records and there is no evidence the corporation refused to allow her or her agents to examine and make extracts of those records.

In March 2003, Ann's attorney at that time, Jim Hartnett, made a written request to review and have copied fourteen categories of information about RIC and the shareholder trusts. After an exchange of several letters regarding the documents, Lutes wrote Hartnett on March 28, stating that he could come review the materials assembled to that point during regular business hours. On April 14, Lutes notified Hartnett that all of the requested materials were assembled and available for Hartnett's review. On May 6, Hartnett went to RIC's offices and spent a few hours examining the documents. A dispute then arose over the copying of the documents. Hartnett wanted to have a copy service remove all the documents from RIC's premises, copy them, and return the originals to RIC. RIC did not want certain of its original corporate documents to leave the premises. RIC told Hartnett that he could have a copy service bring its copiers onto RIC's premises and copy the documents or that, alternatively, Hartnett could use RIC's copiers and staff at a cost of twenty-five cents per page.

After an exchange of correspondence, Ritchie eventually offered to allow all documents other than the original minute books and stock books to be copied offsite by a copy service and to allow the original books to be copied onsite by a copy service. Ritchie's May 21 letter to Hartnett stated that all the requested materials remained available for inspection, review, extracting, and copying at RIC's office. Hartnett's representation of Ann ended sometime in May.

Ann asserts Hartnett testified he never received the documents that he wanted copied. Hartnett's testimony was as follows:

Q. In the context of this case, did you ever receive the documents that you wanted copied?

A. No. I went to—they did produce what was represented to be all of the documents. I looked through them for a few hours and then we spent the rest of the time fighting about whether my copy service was going to be able to go get them and copy them.

This evidence shows appellants complied with Ann's right to have her attorney examine and make extracts of the corporate books and records.

Hartnett also testified he thought appellants were "stalling" in telling him to look to Ann for the information he requested. And Ann testified generally that she did not receive all the "documents" she "wanted" until after she filed suit. However, the correspondence among Hartnett, Lutes, and Ritchie shows appellants never refused to provide access to the information requested, and they provided access to the information within the time period Hartnett proposed.

■ Ann asserts appellants' refusal to allow Hartnett to remove the corporate books and records from RIC's premises for photocopying is evidence that appellants interfered with Hartnett's review of the documents and his ability to make extracts. The shareholder's right under

---

48. As noted earlier, the trial court did not award Ann attorneys' fees for trial because she failed to segregate the attorney's fees that could be awarded from those that could not.

article 2.44(C) "to make extracts" from the corporate books and records includes the right to make photocopies. *See Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 697–98 (Tex.App.-Fort Worth 2006, pet. denied); *see also* TEX. BUS. ORGS. CODE ANN. § 21.218(b) (West 2010) (shareholder "is entitled to examine and copy ... the corporation's relevant books"). Although RIC was required to permit Hartnett to make photocopies of the requested information, the company was entitled to impose reasonable restrictions for the protection and integrity of its books and records. Ann has not shown that requiring some of RIC's original books remain on its premises to be copied was an unreasonable restriction on her right to make extracts of the books and records. Thus, we reject Ann's argument.

Accordingly, we conclude there is no more than a scintilla of evidence that appellants withheld corporate books and records from Ann in violation of article 2.44(C). Thus, we sustain appellants' second issue, reverse that portion of the trial court's judgment awarding attorney's fees, and render judgment that Ann take nothing on her claim for attorney's fees.

## VII. ARGUMENTS SEEKING REMAND

In their fourth issue, appellants present five arguments for reversal and remand of the cause. They assert the trial court erred by granting Ann leave to file a trial amendment of her petition, by denying appellants leave to designate a rebuttal expert on valuation, and by admitting unreliable expert testimony regarding the value of the Stock presented by Ann. In their brief, appellants assert the evidence is factually insufficient to support some of the jury findings. Appellants also assert the case should be remanded because Ann's counsel injected racial prejudice into the jury argument. Finally, appellants argue that "[c]umulative error and/or the interest of justice require reversal." Because we have determined a remand is necessary on the valuation of the Stock, we address these arguments only to the extent they could entitle appellants to a remand of the merits of Ann's oppression claim based on appellants' refusal to meet with prospective purchasers of the Stock.

### A. Trial Amendment

In her original petition, Ann alleged her causes of action against Ritchie, Paula, and Lutes in their individual capacities. During trial, the court granted Ann leave to amend her petition alleging Ritchie, Paula, and Lutes were liable in their capacities as directors of RIC and trustees of the different shareholder trusts. Appellants assert the trial court erred by granting Ann leave to amend her petition during the trial.

After the time for filing amended pleadings has passed, the trial court abuses its discretion in denying leave to file an amended pleading unless (1) the party opposing the amendment presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment. *State Bar v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex.1994) (per curiam); *Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex.1990); *G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co.*, 177 S.W.3d 537, 542 (Tex.App.-Dallas 2005, no pet.). An amendment that is prejudicial on its face has three defining characteristics: (1) it asserts a new substantive matter that reshapes the nature of trial itself; (2) the opposing party could not have anticipated the new matter in light of the development of the case up to the time the amendment was requested; and (3) the amendment would detrimental-

ly affect the opposing party's presentation of its case. *Halmos v. Bombardier Aerospace Corp.,* 314 S.W.3d 606, 622 (Tex. App.-Dallas 2010, no pet.). The decision to allow or deny the amendment rests with the sound discretion of the trial court, and the trial court's decision will not be overturned unless it constitutes a clear abuse of discretion. *Kilpatrick,* 874 S.W.2d at 658; *G.R.A.V.I.T.Y.,* 177 S.W.3d at 542. The burden of showing surprise or prejudice rests on the party opposing the amendment. *Greenhalgh,* 787 S.W.2d at 939.

After the parties had closed the evidence, appellants moved for a directed verdict asserting they were not liable in their individual capacity. Ann then requested leave to amend the petition to allege appellants' liability in their representative capacities and later filed a written amendment to that effect. The trial court held a hearing to determine whether appellants were prejudiced and surprised by the amendment.

██ At the hearing, appellants' counsel told the trial court that Ann was put on notice of appellants' lack-of-capacity argument in their motion for summary judgment. However, after further questioning by the court and Ann's counsel, appellants' counsel admitted the issue was not expressly raised in the motion for summary judgment. Thirty-two days before the beginning of trial, appellants filed an answer containing a verified denial of Ritchie, Paula, and Lutes's liability in their individual capacities. Appellants' counsel told the court that after appellants filed the verified denial, she expected Ann to amend her petition in response to the verified denial. Appellants' counsel explained that appellants were prejudiced by the amendment because it left them with insufficient time to investigate various trial-related issues arising with the trusts included as defen-

dants, including limitations, proportionate responsibility, contribution, and whether to present expert testimony about trusts and trustees. Counsel told the court that appellants might have designated Ritchie or Lutes as an expert to testify about trusts and trustees. The trial court suggested that Ritchie and Lutes could be recalled to testify about trusts and trustees, but counsel rejected that opportunity, stating, "We would also need time just to analyze and to determine what the strategy is, what the defense is, you know, preparing the witnesses." Appellants' counsel also told the court the inclusion of the trusts in the suit raised issues concerning counsel's compensation and whether each defendant trustee should have had separate counsel.

Ann argued to the trial court that appellants had not shown actual prejudice but only assertions that they might have proceeded differently. The trial court asked appellants' counsel whether a continuance was requested, and counsel stated that no continuance was sought. The court then granted the trial amendment, stating:

> The Court believes that the trial amendment would serve the presentation on the merits of the case.... With respect to proving prejudice, lead counsel for the defense pretty much said that there was no surprise as to the amendment being filed, just the timing.... I don't see how this amendment asserts a new cause of action or defense that alters the nature of the trial itself. I think we still have the same trial.... In addition to that, the new matter could have been anticipated by the opposing party. As a matter of fact, it was admitted that it was. And I don't believe that the presentation of the case was affected because ... the amendment was known to the defense prior to their closing of evidence. During their case in chief, they did not file a motion for continuance to

allow them to present new evidence or new witnesses. During their argument this morning with respect to whether or not the trial amendment should be granted, defense again did not ask for a continuance.... [N]o party had asked for a motion for continuance in order to allow them an opportunity to present more evidence or to research issues....

Appellants argue the trial amendment was prejudicial on its face and that they presented substantial evidence of surprise and prejudice. However, based on the record before it, the trial court could have reasonably concluded that the amendment did not reshape the nature of the trial itself, that appellants anticipated the new matter in light of the case, and that the amendment did not detrimentally affect appellants' presentation of their case. *See Halmos,* 314 S.W.3d at 622. Further, the evidence regarding surprise and prejudice was disputed. *See Kirkpatrick v. Mem'l Hosp. of Garland,* 862 S.W.2d 762, 776 (Tex.App.-Dallas 1993, writ denied) (a trial court does not abuse its discretion when it makes a decision on conflicting evidence). We cannot conclude the trial court acted without reference to guiding rules or principles regarding trial amendments in ruling on the request. Accordingly, the trial court did not abuse its discretion in granting Ann leave to amend her petition.

## B. Exclusion of Appellants' Valuation Expert

Appellants assert the trial court erred by denying them leave to designate Don Erickson as an expert witness on the valuation of RIC. Ann responds that appellants' attempted designation of Erickson was untimely and that the trial court did not abuse its discretion in denying them leave to designate Erickson. In light of the remand of the valuation issue, we need not address this argument. We leave to the trial court any decisions on discovery and designation of expert witnesses regarding value on remand. *See* Tex.R.App. P. 47.1.

## C. Ann's Valuation Experts

Appellants also assert the case must be remanded for a new trial because the trial court abused its discretion in denying appellants' motion to exclude Ann's valuation experts, the Latins. As the case is being remanded for further proceedings concerning the valuation of the Stock, we need not address this issue. *See* Tex.R.App. P. 47.1.

## D. Factually Insufficient Evidence

In the argument section of their brief, appellants assert the evidence is factually insufficient to support various jury answers. They do not, however, include this issue in their issues presented. *See* Tex. R.App. P. 38.1(f). We have already addressed many of those arguments in this opinion, but to the extent we have not, the remaining arguments present nothing for review. *Id.* Moreover, appellants' arguments do not challenge the factual sufficiency of the evidence to support the conclusion that their refusal to meet with potential purchasers of the Stock was oppressive conduct. Indeed, the evidence supporting this conclusion was undisputed. Thus the resolution of appellants' other factual sufficiency arguments are not necessary to the final disposition of the appeal. Accordingly, we do not address them. *See* Tex.R.App. P. 47.1.

## E. Jury Argument

Appellants assert that "[a]ppellee's counsel presented an improper and incurable jury argument that injected racial prejudice into the case." The argument of Ann's counsel about which appellants complain was as follows:

You know one thing that I think every single person in this courtroom would agree with me on is that we as United States citizens are proud of the fact and love telling people elsewhere that we do not live in an oppressed society. We do not oppress people based on their race, on their religion, whether they believe in God, whether they don't believe in God, whether they're male, female. We don't let you oppress our children.

And what is so amazing about this system is that greatness about our country extends into this courtroom. For the law says if you are a majority shareholder in a corporation, you must treat all shareholders equally. You cannot oppress them because they are a minority. And that's exactly what we have here.

Appellants did not object to this argument at trial, and we see nothing on the face of the argument that injects race or racial prejudice into the case.

Appellants state that this argument is racially prejudicial in the context of evidence presented during the first day of testimony when Ann's counsel questioned Paula about the disposition in Pops's will of his interest in the "Koon Kreek Klub." At the time appellants did not object to those questions. However, in their motion for new trial, appellants first raised the issue of improper jury argument, asserting that the alliteration of the initial letter "K" in "Koon Kreek Klub" evokes racism by implicitly referring to the "KKK" or Ku Klux Klan, and that, in that context, the closing argument amounts to charges of racism leveled against appellants.

Appellants did not present any evidence showing or even suggesting that the Koon Kreek Klub was, or ever had been, connected with racism or the Ku Klux Klan. Further, error in improper jury argument must be preserved by a timely and overruled objection. *See* Tex.R.App. P. 33.1(a); Tex.R. Civ. P. 324(b)(5). A trial court's instruction to a jury to disregard improper argument can cure harm in most cases. *See Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979).

There are rare instances in which a party may complain about a jury argument on appeal despite the absence of a timely objection. In those instances the harm or prejudice is such that it could not be cured by an appropriate instruction. *See Living Ctrs. of Tex., Inc. v. Peñalver,* 256 S.W.3d 678, 680 (Tex.2008) (per curiam). "[A]rguments that strike at the courts' impartiality, equality, and fairness inflict damage beyond the parties and the individual case under consideration if not corrected. Such arguments damage the judicial system itself by impairing the confidence which our citizens have in the system, and courts countenance very little tolerance of such arguments." *Id.* at 681. Appellants contend this case involves such an instance of incurable harm or prejudice.[49]

▮ We disagree. The jury argument in this case involves no such extreme attack on opposing counsel or blatant accusation of racial prejudice. Appellants presented no evidence that the Koon Kreek Klub had any racist identification, history, or connections. The argument did not even mention the Koon Kreek Klub, the Ku Klux Klan, or the KKK, nor did it otherwise state or imply that appellants were racists. Unlike the argument in *Living Centers,* the argument in this case did

49. In *Living Centers,* plaintiff's counsel compared defense counsel to the perpetrators of Germany's World War II T–4 Project in which elderly and infirm persons were used for medical experimentation and killed. *Living Ctrs.,* 256 S.W.3d at 680. The supreme court concluded the argument struck at the integrity of the courts and was so prejudicial that the error required reversal without a timely objection. *Id.* at 682.

not "strike at the courts' impartiality, equality, and fairness," and it would not "inflict damage beyond the parties and the individual case under consideration if not corrected." *Id.*[50]

We conclude appellants have not shown that Ann's jury argument—alone or in conjunction with testimony early in the trial concerning Pops's membership in the Koon Kreek Klub—injected accusations of racial prejudice that were incurable, thus obviating the need for an objection in order to preserve any error. Indeed, we find nothing about the argument was incurable. Thus, any complaint about the jury argument was waived by appellants' failure to object at trial. *See* Tex.R.App. P. 33.1(a); *Reese*, 584 S.W.2d at 840–41.

## F. Cumulative Error

Appellants contend the cause should be remanded for new trial because of "various other errors that infected the trial and necessitate reversal of the judgment." Appellants then list five alleged errors, one of which they admit was not preserved for appellate review. Appellants present no argument or authority showing the trial court erred in these matters. We conclude these contentions are not properly briefed and present nothing for appellate review. *See* Tex.R.App. P. 38.1(i).

We overrule appellants' fourth issue.

## VIII. CONCLUSION

We conclude that appellants' refusal to meet with or allow any officer or director of RIC to meet with potential purchasers of the Stock was oppressive conduct and that the trial court did not abuse its discretion by ordering RIC to buyout the Stock

as an appropriate equitable remedy. However, we conclude the trial court erred by instructing the jury not to include discounts in determining the fair market value of the Stock. We also conclude the trial court erred in awarding Ann attorney's fees in the event of an appeal. Accordingly, we reverse those parts of the trial court's judgment determining the amount of the buyout remedy and awarding conditional attorney's fees on appeal, we remand the determination of the value of the Stock to the trial court for further proceedings, and we render judgment that Ann take nothing on her claim for attorney's fees. In all other aspects, we affirm the trial court's judgment.

---

50. Appellants also cite to *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1 (Tex.2008). *Coastal Oil & Gas* is distinguishable because it does not concern jury argument, except insofar as it showed harm from the erroneous admission of an objected-to memo. That case does not concern the issue before us, namely, incurable error in unobjected-to jury argument.